[No. B207468. Second Dist., Div. Four. July 1, 2010.]

BARRY A. BOWMAN, Plaintiff and Respondent, v.
TOMMIE WYATT, JR., et al., Defendants and Appellants.

**Counsel**

Law Office of Stephen S. Talt and Stephen S. Talt for Defendant and Appellant Tommie Wyatt, Jr.

John P. DeGomez; Greines, Martin, Stein & Richland, Feris M. Greenberger, Carolyn Oill and Sheila A. Wirkus for Defendant and Appellant City of Los Angeles.

Robert S. Gerstein; Tourtelot & Butler, Robert H. Tourtelot and T. Sean Butler for Plaintiff and Respondent.

**Opinion**

**SUZUKAWA, J.—**

## INTRODUCTION

Plaintiff Barry A. Bowman (plaintiff or Bowman) brought the present action after suffering devastating injuries when his motorcycle collided with a dump truck owned and operated by defendant Tommie Wyatt, Jr. (Wyatt). The collision occurred shortly after Wyatt delivered a load of asphalt to a worksite of defendant City of Los Angeles (City), with whom Wyatt was under contract.

The jury found that Wyatt caused the accident by negligently making a left turn in front of Bowman's motorcycle. The jury further found that Wyatt was a City employee, that the City breached a duty to inspect and maintain the dump truck's brakes, that the truck was controlled by the City and was in a dangerous condition, and that the work in which Wyatt was engaged at the time of the accident involved a special risk of harm. It returned a verdict for Bowman of over $15 million.

The City has appealed, contending that (1) the jury was misinstructed on several critical issues, including the factors it was to consider in determining if Wyatt was an employee or independent contractor; (2) there was no substantial evidence to support a finding that defects in the dump truck's brakes were a proximate cause of the accident; (3) as a matter of law, the work in which Wyatt was engaged did not involve a peculiar risk of harm; and (4) the trial court erred in deciding as a matter of law that the City was the dump truck's "motor carrier" within the meaning of Vehicle Code sections 408 and 34501.12. Wyatt has also appealed, contending that the court abused its discretion by allowing evidence that Wyatt's motor carrier permit had been suspended, allowing lay opinion testimony, and limiting the testimony of defendants' expert.

We agree with the City that the trial court erred by misinstructing the jury about the factors relevant to determining whether Wyatt was an employee or an independent contractor, allowing the jury to find that the work in which Wyatt was engaged involved a peculiar risk of harm, and instructing the jury that the City was the motor carrier as a matter of law. We further agree with the City that substantial evidence did not support the jury's finding that defects in the dump truck's brakes were a proximate cause of the accident. Because these errors infected all four bases of liability Bowman asserted against the City, we reverse the judgment for Bowman and against the City, and remand for a limited retrial on vicarious liability.

With respect to Wyatt's appeal, we conclude that his contentions are without merit and affirm the jury finding as to his liability.

## FACTUAL AND PROCEDURAL BACKGROUND

Bowman was seriously injured on October 13, 2004, when the motorcycle he was riding collided with a dump truck driven by Wyatt. Bowman had been traveling southbound on Wilbur Avenue in Northridge; Wyatt was traveling eastbound on Vanalden Avenue, rolled through a stop sign, and collided with Bowman at the intersection of Wilbur and Vanalden as he began making a left turn. As a result of the accident, Bowman suffered traumatic brain injury, a stroke, hearing and vision loss, a jaw laceration, a frozen shoulder, compound

leg fractures, and a hip fracture. At the time of trial, he remained blind in one eye, walked with a cane, and suffered severe mental impairment that interfered with his memory and reasoning.

When the accident occurred, Wyatt was under contract with the City of Los Angeles, Bureau of Street Services, to deliver asphalt to City worksites on an as-needed basis.[1] Wyatt had just delivered a load of asphalt for the City and was returning to a City yard to determine if there was another load for him to haul.

Bowman sued Wyatt and the City for personal injuries. The operative third amended complaint alleged that Wyatt failed to stop at the stop sign and/or to yield the right-of-way to Bowman; defendants negligently failed to maintain the dump truck's brakes; Wyatt was engaged in an activity that lawfully could be carried out only pursuant to a permit from the State of California; the City was vicariously liable for the harm to Bowman because Wyatt's duties involved possible danger to the public and were nondelegable; the operation of the dump truck was, as a matter of law, an activity involving an unreasonable risk of harm to others; Wyatt's operation of the dump truck was pursuant to the Motor Carriers of Property Permit Act (Veh. Code, § 34600 et seq.); and the City had a nondelegable duty to exercise due care toward Bowman as a member of the driving public.

The case went to trial before a jury in November 2007. Bowman presented evidence that the dump truck's brakes failed, Wyatt's motor carrier permit had been suspended, and required safety inspections had not been performed as required by law. Defendants presented evidence that the brakes did not fail, Wyatt's motor carrier permit had not been suspended, required inspections were performed, and the City was not responsible for maintaining the dump truck.[2]

After hearing several weeks of testimony, the jury returned a verdict for Bowman, finding as follows:

"1. On the claim of Barry Bowman for negligence against Tommie Wyatt[,] we find in favor of Barry Bowman and against Tommie Wyatt[.]

"2. On the claim of Barry Bowman against the City of Los Angeles for failure to inspect or maintain the brakes of the truck it leased from Tommie Wyatt[,] we find in favor of Barry Bowman and against the City of Los Angeles[.]

---

[1] We discuss the terms of the contract between Wyatt and the City in part V.B.1., *post.*

[2] We discuss the evidence in greater detail below.

"3. On the claim of Barry Bowman against the City of Los Angeles that the truck was controlled by the City and was in a dangerous condition[,] we find in favor of Barry Bowman and against the City of Los Angeles[.]

"4. On the claim of Barry Bowman against the City of Los Angeles that the work of Tommie Wyatt and the dump truck involved a special risk of harm[,] we find in favor of Barry Bowman and against the City of Los Angeles[.] . . .

"5. On the claim of Barry Bowman against the City of Los Angeles that Tommie Wyatt was an 'employee' of the City and not an independent contractor[,] we find in favor of Barry Bowman and against the City of Los Angeles . . . ."

The jury found that Wyatt was 25 percent responsible for the accident and the City was 75 percent responsible. It awarded damages as follows:

| | |
|---|---|
| Past economic loss: | $776,399[3] |
| Future economic loss: | $3,959,005 |
| Past noneconomic loss: | $1,500,000 |
| Future noneconomic loss: | $9,500,000 |
| TOTAL: | **$15,735,404** |

Judgment was entered on January 28, 2008, and notice of entry of judgment was served on January 30, 2008. The trial court denied defendants' motions for new trial and for judgment notwithstanding the verdict. This timely appeal followed.

## THE CITY'S APPEAL

The City contends (1) the jury was misinstructed on critical issues, including the factors it should consider in determining if Wyatt was an employee or independent contractor of the City; (2) the trial court erred in allowing the jury to find that Wyatt's use of the dump truck involved a special risk of harm; (3) substantial evidence did not support a finding that the condition of the brakes was a proximate cause of the accident and Bowman's injuries; and (4) the trial court erred in finding that the City was the "motor carrier" as a matter of law. We consider each issue below.

---

[3] The judgment erroneously indicated an award of $776,339 for past economic loss, but it accurately reflected the total damages award of $15,735,404.

I. *The Trial Court Misinstructed the Jury on the Factors Relevant to Determining Whether Wyatt Was an Employee or Independent Contractor*

### A. *The CACI No. 3704 Instruction*

At Bowman's request, the jury was instructed pursuant to Judicial Council of California Civil Jury Instructions (CACI) No. 3704 that it must determine whether Wyatt was an employee or an independent contractor of the City, as follows:[4]

"In deciding whether Tommie Wyatt, Junior was the City of Los Angeles's employee, you must first decide whether the City of Los Angeles had the right to control how Tommie Wyatt, Junior performed the work, rather than just the right to specify the result.

"It does not matter whether City of Los Angeles exercised the right to control. If you decide that the right to control existed, then Tommie Wyatt, Junior was the City of Los Angeles's employee.

"If you decide that the City of Los Angeles did not have the right of control, then you must consider all the circumstances in deciding whether Wyatt was the City of Los Angeles's employee.

"The following factors, if true, may show that Wyatt was the employee of the City of Los Angeles:

"A, The City of Los Angeles supplied the equipment, tools and place of work;

"B, Tommie Wyatt, Junior was paid by the hour rather than by the job;

"C, The work being done by Tommie Wyatt, Junior was part of the regular business of the City of Los Angeles;

"D, The City of Los Angeles had an unlimited right to end the relationship with Tommie Wyatt, Junior;

"E, The work being done by Tommie Wyatt, Junior was the only occupation or business of Tommie Wyatt, Junior;

---

[4] "Whether a person is an independent contractor or an employee is a question of fact if dependent upon the resolution of disputed evidence or inferences. [Citation.]" (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 609, fn. 6 [262 Cal.Rptr. 842].)

"F, The kind of work performed by Tommie Wyatt, Junior is usually done under the direction of a supervisor rather than by a specialist working without supervision;

"G, The kind of work performed by Tommie Wyatt, Junior does not require specialized or professional skill;

"H, The services performed by Tommie Wyatt were to be performed over a long period of time;

"and I, The City of Los Angeles and Tommie Wyatt, Junior acted as if they had an employer-employee relationship."[5]

The City contends that this instruction is erroneous because it told the jury that the right of control, *by itself*, compelled a finding that Wyatt was a City employee. In other words, the City says, the instruction told the jury that if it found that the City had the right to control how Wyatt performed his work, then it *must* find that he was a City employee. The instruction misstates the law, the City argues, because while the existence of control is an important factor in determining whether someone is an employee or an independent contractor, it is not the only factor. Instead, where the right to control is not absolute, "the fact finder must be allowed to weigh the extent of the control that could be exercised against additional factors to determine if the worker is more like an employee or more like an independent contractor."

■ We review de novo whether a challenged instruction correctly states the law.[6] (*Isip v. Mercedes-Benz USA, LLC* (2007) 155 Cal.App.4th 19, 24 [65 Cal.Rptr.3d 695]; *Sander/Moses Productions, Inc. v. NBC Studios, Inc.* (2006) 142 Cal.App.4th 1086, 1094–1095 [48 Cal.Rptr.3d 525]; *National Medical Transportation Network v. Deloitte & Touche* (1998) 62 Cal.App.4th 412, 439 [72 Cal.Rptr.2d 720].) For the reasons that follow, we conclude that CACI No. 3704 does not accurately state the law.[7]

---

[5] This instruction precisely tracked the language of CACI No. 3704; it differed from the model instruction only in that it substituted the parties' names for "[plaintiff]" and "[defendant]."

[6] Plaintiff suggests, without citation to any authority, that CACI instructions are entitled to a "presumption of correctness." We reject that suggestion as unsupported by the case law. (See *Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 82 [55 Cal.Rptr.3d 600], citing *People v. Alvarez* (1996) 14 Cal.4th 155, 217 [58 Cal.Rptr.2d 385, 926 P.2d 365] ["Pattern jury instructions, . . . while designed to accurately reflect the law, are not the law itself."].)

[7] Bowman contends that the City waived its claim of instructional error because it failed to object to the employee/independent contractor instruction in the trial court. We disagree. " 'A failure to object to civil jury instructions will not be deemed a waiver where the instruction is prejudicially erroneous as given, that is, which is an incorrect statement of the law.' " (*Carrau v.*

B. *The Law Governing the Employee/Independent Contractor Distinction*

■ The distinction between an employee and an independent contractor is a significant one: With some exceptions, an employer is vicariously liable for the negligent acts of its employees, but not of its independent contractors. (E.g., *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350 [256 Cal.Rptr. 543, 769 P.2d 399] (*Borello*) ["The distinction between independent contractors and employees arose at common law to limit one's vicarious liability for the misconduct of a person rendering service to him."]; *Weiss v. Chevron, U.S.A., Inc.* (1988) 204 Cal.App.3d 1094, 1100 [251 Cal.Rptr. 727] [noting "general rule refusing to impose vicarious liability for the negligence of an independent contractor"].) Accordingly, there is a rich body of case law discussing when a worker is an "employee" or an "independent contractor."

1. *Supreme Court Authority*

■ The "seminal case" (*Truesdale v. Workers' Comp. Appeals Bd.* (1987) 190 Cal.App.3d 608, 615 [235 Cal.Rptr. 754]) addressing the employee/independent contractor distinction is *Empire Star Mines Co. v. Cal. Emp. Com.* (1946) 28 Cal.2d 33 [168 P.2d 686] (*Empire Star*), disapproved on other grounds in *People v. Sims* (1982) 32 Cal.3d 468, 479–480, footnote 8 [186 Cal.Rptr. 77, 651 P.2d 321]. That case arose under the Unemployment Insurance Act, pursuant to which employers were required to pay unemployment insurance taxes for employees, but not for independent contractors. (*Empire Star*, at p. 36.) In affirming the trial court's determination that the defendant mining company's lessees were independent contractors, the Supreme Court identified a number of factors relevant to distinguishing independent contractors from employees. The most important factor was "the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists." (*Id.* at p. 43.) The court also identified a series of "[o]ther factors" to be taken into consideration: "(a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the

---

*Marvin Lumber & Cedar Co.* (2001) 93 Cal.App.4th 281, 296 [112 Cal.Rptr.2d 869]; see also *Brown v. Smith* (1997) 55 Cal.App.4th 767, 783, fn. 11 [64 Cal.Rptr.2d 301] ["Jury instructions which are erroneous on a material element of law are deemed excepted to even absent any objection at trial."].) Because we conclude, for reasons discussed more fully below, that CACI No. 3704 erroneously states the law, it was "deemed excepted to" by the City, even without any objection at trial.

principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. (Rest., Agency, § 220; Cal.Ann. § 220.)" (*Id.* at pp. 43–44.)

The Supreme Court again addressed the employee/independent contractor distinction in *Malloy v. Fong* (1951) 37 Cal.2d 356 [232 P.2d 241]. There, the plaintiff was injured in a car accident while attending a vacation Bible school run by his church. The issue before the court was whether the church was vicariously liable for the alleged negligence of the church's pastor and his assistant. (*Id.* at pp. 360–363, 370.) The court identified the right of control as the primary factor in determining whether a person performing work for another is an agent or an independent contractor, but noted that the additional factors outlined in *Empire Star* were also relevant. (*Id.* at pp. 370–371.) The court addressed each of the factors before concluding that the pastor was an employee, not an independent contractor. (*Id.* at pp. 371–372.)

The Supreme Court revisited the factors relevant to distinguishing employees from independent contractors in *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943 [88 Cal.Rptr. 175, 471 P.2d 975]. There, the director of employment (director) levied assessments against a television production company for unemployment insurance contributions assertedly due based on salaries paid to writers who were employed to write television stories and plays. Such contributions were required only if the writers were employees rather than independent contractors. (*Id.* at p. 946.) The trial court agreed with the director and found that the writers were employees; the production company appealed. (*Ibid.*) The Supreme Court held that in determining that the production company was an employer, the trial court "improperly restricted its consideration to whether [the production company] had the right to and did exercise control over the writers' work." (*Ibid.*) It explained that while the right of control is the "principal test" of an employment relationship, the court should also have considered the additional factors identified in *Empire Star*. (*Id.* at pp. 946–947.) Indeed, it said, while the right to control and direct the individual who performs services as to the details and means by which the result is accomplished is the most important consideration, it is *"not the only element* in determining whether an employment relationship has been created." (*Id.* at p. 950, italics added.) The court thus considered all of the *Empire Star* factors before agreeing with the trial court that an employment relationship existed between the production company and its writers. (*Id.* at p. 955.)

■ The Supreme Court most recently discussed the employee/independent contractor distinction in *Borello, supra*, 48 Cal.3d 341. There, it considered whether agricultural workers were employees or independent contractors within the meaning of the Workers' Compensation Act. It discussed the relevant legal principles as follows: "Following common law tradition, California decisions . . . uniformly declare that '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. . . .' [Citations.] [¶] However, the courts have long recognized that the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements. While conceding that the right to control work details is the 'most important' or 'most significant' consideration, the authorities also endorse several 'secondary' indicia of the nature of a service relationship." (48 Cal.3d at p. 350.) Those "secondary indicia" "have been derived principally from the Restatement Second of Agency." (*Id.* at p. 351.) They generally " 'cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' " (*Ibid.*)

After reviewing the factors traditionally considered to determine whether workers are employees or independent contractors, the court declined to adopt new standards for examination of the issue. Instead, it determined that "the Restatement guidelines heretofore approved in our state remain a useful reference." (*Borello, supra*, 48 Cal.3d at p. 354.) It also noted with approval "the six-factor test developed by other jurisdictions . . . . Besides the 'right to control the work,' the factors include (1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business. [Citation.]" (*Id.* at pp. 354–355.) It concluded: "As can be seen, there are many points of individual similarity between these guidelines and our own traditional Restatement tests. [Citation.] We find that all are logically pertinent to the inherently difficult determination whether a provider of service is an employee or an excluded independent contractor . . . ." (*Id.* at p. 355.)

### 2. *Appellate Court Authority*

Taken together, the body of Supreme Court authority discussed above stands for the proposition that while the right of control is the "primary" factor to be considered in determining whether a worker is an employee or an independent contractor, a group of "secondary" factors also must be considered. Accordingly, appellate cases consistently apply a multifactor test in

evaluating employee/independent contractor determinations. The recent case of *Messenger Courier Assn. of Americas v. California Unemployment Ins. Appeals Bd.* (2009) 175 Cal.App.4th 1074 [96 Cal.Rptr.3d 797] is illustrative. There, an employer association brought an action for declaratory judgment, seeking to invalidate a precedential decision by the California Unemployment Insurance Appeals Board (board) that designated certain truckdrivers as employees, not independent contractors. The action was brought under section 621, subdivision (b), of the Unemployment Insurance Code, which defines an "employee" as " '[a]ny individual who, *under the usual common law rules applicable in determining the employer-employee relationship*, has the status of an employee.' " (*Messenger Courier*, at p. 1085, original italics.) The employer association contended that under the italicized language of the statute, the board lacked jurisdiction to consider the "secondary criteria" established by case law, but instead must consider only the common law " 'control of details' " test to determine employee status. (*Id.* at pp. 1088–1089.) The court disagreed. It explained: "[W]e glean that our Supreme Court's and other courts' applications of both primary and secondary criteria of employment determinations are in the process of becoming part of the common law of this state, as expressed in judicial decisions such as *Empire Star, supra*, 28 Cal.2d 33, and *Borello, supra*, 48 Cal.3d 341. . . . [¶] We accordingly reject plaintiff's basic premise that the primary or common law test for employment status, regarding the right to control, must operate completely exclusively from the secondary factors that have been identified in other factual contexts as useful for determining employment status. There is nothing in the historical development of the common law to justify confining the statutory terminology in section 621, subdivision (b), to a narrow common law test for employment, simply because this is an unemployment insurance assessment case. The terms of section 621, subdivision (b) must be interpreted in light of comparable, complementary and overlapping criteria developed in case law . . . ." (*Id.* at pp. 1091–1092.) It concluded: "[P]laintiff has provided no persuasive reason to fault the Board's reasoning in clarifying that both the primary and secondary *Borello* tests have application to unemployment insurance determinations under section 621, subdivision (b), *because the secondary criteria have been incorporated into the 'usual common law rules' mentioned in that subdivision.*" (*Id.* at p. 1095, italics added; see also *Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 85 [89 Cal.Rptr.3d 34] [approving instruction that told the jury that in determining whether plaintiff truckdrivers were employees or independent contractors, it must " 'consider a number of factors' " and " 'weigh all of these factors based on the evidence that you have heard' "]; *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1 [64 Cal.Rptr.3d 327] [trial court correctly applied multifactor *Borello* test in determining that drivers were employees, not independent contractors, for

limited purpose of their entitlement to reimbursement for work-related expenses]; *Air Couriers Internat. v. Employment Development Dept.* (2007) 150 Cal.App.4th 923 [59 Cal.Rptr.3d 37] [multifactor *Borello* test applied in employment tax context]; *Ali v. L.A. Focus Publication* (2003) 112 Cal.App.4th 1477 [5 Cal.Rptr.3d 791] [multifactor test applied to determine whether plaintiff was an employee and, hence, permitted to assert wrongful termination claim]; *State Compensation Ins. Fund v. Brown* (1995) 32 Cal.App.4th 188, 202 [38 Cal.Rptr.2d 98] [multifactor test applied to conclude that, for unemployment insurance purposes, contract truckdrivers were independent contractors as a matter of law; under *Borello*, "[r]ight of control retains significance, but is no longer determinative"].)[8]

### C. *CACI No. 3704 Does Not Correctly State the Law Because It Instructs a Jury That the Right of Control, by Itself, Is Dispositive*

As the cases discussed above make clear, the right of control is an important factor in determining whether a worker is an employee or an independent contractor, but it is not the only factor. Indeed, the Supreme Court has said, "the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements." (*Borello, supra*, 48 Cal.3d at p. 350.) Thus, as we have demonstrated, the cases consistently endorse a multifactor test that considers not only the right of control, but also secondary factors such as whether the worker is engaged in a distinct occupation or business, the skill required in the particular occupation, whether the employer or the worker supplies the tools and the place of work, the length of time for which the services are to be performed, whether the worker is paid by time or by the job, whether the work is a part of the regular business of the employer, and the kind of relationship the parties believe they are creating.

CACI No. 3704, given in the present case, did not correctly instruct the jury that it must weigh all of these factors to determine whether Wyatt was an employee or an independent contractor. Instead, it told the jury that if it decided that the City had the right to control how Wyatt performed his work, then it *must* conclude that Wyatt was a City employee. In other words, it told the jury that the right of control, *by itself*, gave rise to an employer-employee relationship. Further, it told the jury that it should consider the secondary factors only "[i]f you decide that the City of Los Angeles did not have the

---

[8] Plaintiff directs our attention to *Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864 [269 Cal.Rptr. 647], urging that it stands for the proposition that "factors other than control will be decisive only if *control* has not been proven." We do not agree that *Toyota Motor Sales* articulates a different rule than that applied in the cases discussed above—nor, in light of the Supreme Court's clear precedent, would we have discretion to follow it if it did. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

right of control." (*Ibid.*) For all the reasons discussed above, this instruction thus is not a correct statement of the law.

### D. The Erroneous Instruction Likely Prejudiced the Jury's Determination That Wyatt Was the City's Employee

■ In determining whether instructional error was prejudicial, a reviewing court evaluates " '(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled' " to determine whether it is "reasonably probable" that erroneous instructions misled the jury. (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 348, 359 [48 Cal.Rptr.3d 875]; see *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 581, fn. 11 [34 Cal.Rptr.2d 607, 882 P.2d 298].) "A 'reasonable probability' in this context 'does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility.*' (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 [34 Cal.Rptr.2d 898, 882 P.2d 894].)" (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682 [36 Cal.Rptr.3d 495, 123 P.3d 931].) Accordingly, "our standard of review in this regard is the opposite of the traditional substantial evidence test. ' "[I]n assessing an instruction's prejudicial impact, we cannot use the view of the evidence and inferences most favorable to the [prevailing party]. [Citations.] Instead, we must assume the jury might have believed [appellant's] evidence and, if properly instructed, might have decided in [appellant's] favor. [Citations.]" [Citation.] Accordingly, we state the facts most favorably to the party appealing the instructional error alleged[.] [Citation.]' (*Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 298 [45 Cal.Rptr.2d 10].)" (*GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.* (2000) 83 Cal.App.4th 409, 423 [99 Cal.Rptr.2d 665], disapproved on other grounds in *Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1153–1154 [17 Cal.Rptr.3d 289, 95 P.3d 513].)

In the present case, it is reasonably probable that the erroneous employment instruction prejudicially affected the jury's conclusion that Wyatt was a City employee, not an independent contractor. There was substantial evidence from which the jury could have concluded that Wyatt was an independent contractor, including the following: City employees testified that Wyatt controlled the dump truck and how it was operated; Wyatt supplied all of his own tools and equipment, including the dump truck, insurance, and a cell phone; Wyatt supplied and paid for his truck's gasoline and oil; Wyatt was responsible for all maintenance and repairs to his dump truck; Wyatt worked on a day-to-day, as-needed basis; the City paid Wyatt by the load, not by the hour; Wyatt did not have a City supervisor; Wyatt's work required him to be skilled in the operation of a dump truck; the agreement between Wyatt and

the City says that he is an independent contractor; Wyatt testified that he worked for his own company, Tommie Wyatt Trucking; City officials considered Wyatt an independent contractor and issued him a form 1099 at the end of each tax year; Wyatt did not receive any employee benefits from the City, such as pension, paid vacation time, paid sick leave; Wyatt was permitted to employ substitute drivers to perform work for the City.

■ Based on all of this evidence, we conclude that a jury properly instructed to consider all of the factors identified in the case law reasonably could have concluded that Wyatt was an independent contractor, not an employee. Therefore, it is reasonably probable that the erroneous employment instruction prejudicially affected the jury's conclusion concerning Wyatt's employment.[9]

## II. Wyatt's Use of the Dump Truck Did Not Involve a Peculiar Risk As a Matter of Law

Bowman alleged at trial that Wyatt's work for the City involved a "special" or "peculiar" risk of harm, and therefore the City was vicariously liable for Bowman's injuries, even if Wyatt was an independent contractor, not an employee. The jury was given a verdict form requesting a special finding on this issue, and it found that "the work of Tomm[ie] Wyatt and the dump truck involved a special risk of harm."

The City contends that the trial court erred in allowing the jury to make this special finding because, as a matter of law, the dump truck did not involve a peculiar risk of harm. For the reasons that follow, we agree.

### A. Overview of the Peculiar Risk Doctrine

■ At common law, a person who hired an independent contractor generally was not liable to third parties for injuries caused by the contractor's negligence in performing the work for which he or she was hired. Over time, the courts created exceptions to this general rule of nonliability. One such exception pertains to contracted work that poses an inherent risk of injury to others, which is commonly referred to as the doctrine of "peculiar" or "special" risk. (*Privette v. Superior Court* (1993) 5 Cal.4th 689, 693 [21 Cal.Rptr.2d 72, 854 P.2d 721].)

The peculiar risk doctrine is discussed in sections 413 and 416 of the Restatement Second of Torts. As relevant to the present case, section 416

---

[9] Because we have concluded that the instruction erroneously stated the factors the jury was to consider in determining whether Wyatt was an employee or independent contractor, we do not reach the City's alternative contention that, as phrased, the instruction was improperly suggestive of the conclusion that Wyatt was an employee.

provides: "One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

"A critical inquiry in determining the applicability of the doctrine of peculiar risk is whether the work for which the contractor was hired involves a risk that is 'peculiar to the work to be done,' arising either from the nature or the location of the work and ' "against which a reasonable person would recognize the necessity of taking special precautions." ' [Citations.] The term 'peculiar risk' means neither a risk that is abnormal to the type of work done, nor a risk that is abnormally great; it simply means ' "a special, recognizable danger arising out of the work itself." ' [Citation.]" (*Privette v. Superior Court, supra,* 5 Cal.4th at p. 695.)

### B. *The Peculiar Risk Doctrine As Applied to Injuries Caused by Large Construction Vehicles*

In several published cases, the appellate courts have discussed the contours of the peculiar risk doctrine as applied to liability for injuries caused by large construction vehicles. The earliest of these cases is *Anderson v. L. C. Smith Constr. Co.* (1969) 276 Cal.App.2d 436 [81 Cal.Rptr. 73] (*Anderson*), where an engineer working on a freeway construction project was killed at the jobsite when a dump truck loaded with asphalt backed up over him. The decedent had been marking a chalk line for a paving machine to follow when he was struck; the paving operation required the paving machine to move forward along the chalk line, while dump trucks backed up to the paver to load asphalt into its hopper. (*Id.* at pp. 438–439.) The decedent's survivors sued the dump truck driver, the general contractor, and the trucking company to whom the hauling of asphalt had been subcontracted. The jury found for the defendants. (*Ibid.*)

The plaintiffs appealed, contending that the trial court erred in refusing to instruct the jury on peculiar risk. (*Anderson, supra,* 276 Cal.App.2d at p. 439.) The appellate court agreed that a peculiar risk instruction should have been given, concluding without analysis as follows: "The evidence contained in the record herein is certainly sufficient to support findings that (1) the type of work done by [the paving subcontractor] involved 'a peculiar risk of physical harm to others unless special precautions are taken' and (2) [the paving subcontractor] failed 'to exercise reasonable care to take such precautions.' " (*Id.* at p. 446.)

The court reached a similar result in *Castro v. State of California* (1981) 114 Cal.App.3d 503 [170 Cal.Rptr. 734] (*Castro*). There, the plaintiff was a dump truck driver who worked for a construction company hired by the state to install a pipeline. The plaintiff had gotten out of his truck while waiting to pull forward to load and was injured when a fellow driver backed into him. He sued, asserting that the state was vicariously liable for the other driver's negligence. The jury found for the plaintiff, but the trial court granted a motion for judgment notwithstanding the verdict, concluding that the evidence was insufficient as a matter of law to support the finding of peculiar risk. (*Id.* at pp. 507–509.) The Court of Appeal reversed. It noted that construction procedures on the project required dump trucks to drive to a point beyond the construction site, turn around, and then back down the street for more than a half block. Further, there was evidence that the side mirrors on the dump trucks did not allow drivers to see what was directly behind them at distances of less than 85 feet. (*Castro, supra,* 114 Cal.App.3d at p. 512.) Accordingly, the court concluded that there was sufficient evidence to support the jury's finding of liability under the peculiar risk doctrine: "There was substantial evidence that the state should have recognized that the risk of someone being struck by dump trucks backing up for more than half a block was inherent in the approved plan of operation unless special precautions were taken. While the evidence was conflicting in many respects, the very existence of the conflict rendered it inappropriate for the court to grant the motion for judgment notwithstanding the verdict." (*Id.* at p. 513.)

The court concluded differently in *A. Teichert & Son, Inc. v. Superior Court* (1986) 179 Cal.App.3d 657 [225 Cal.Rptr. 10] (*Teichert*). Like *Anderson* and *Castro, Teichert* involved a serious injury caused by a construction truck; unlike trucks in the earlier cases, the truck in *Teichert* was unladen and was not engaged in construction work at the time of the accident. There, a child was killed when his bicycle collided with a dump truck turning from a public street into a gravel plant owned by Teichert. The child's father sued Teichert and the dump truck's driver; Teichert moved for summary judgment, asserting that because the driver was an independent contractor, it was not liable for his negligence. (*Id.* at p. 660.) The appellate court held that Teichert was entitled to summary judgment because the peculiar risk doctrine did not apply as a matter of law. (*Id.* at p. 661.) It explained: "Plaintiff has failed to identify any peculiar risk inherent in the work [the driver] was engaged in, apart from the ordinary risk that he would not use due care in the driving of his dump truck. There was no direct relationship between the particular work performed by [driver], i.e., hauling a truck load of asphalt, and the accident. The incident could have occurred just as easily if [driver] were driving a standard passenger vehicle or an 'eighteen-wheeler.' [¶] Nor did the frequency of truck traffic into Teichert's plant create a special risk. The collision between

decedent and [driver's] truck would have happened in the same way regardless of whether that truck was the first or the hundredth to enter the facility on that day." (*Id.* at p. 662.)

The court went on to discuss a relevant comment to section 416 of the Restatement Second of Torts. "In disposing of this portion of plaintiff's case we find particularly apropos the illustration set forth in comment *d* to section 416 of the Restatement Second of Torts. That comment reads: 'A "peculiar risk" is a risk differing from the common risks to which persons in general are commonly subjected by the ordinary forms of negligence which are usual in the community. It must involve some special hazard resulting from the nature of the work done, which calls for special precautions. (See § 413, com. *b*.) Thus if a contractor is employed to transport the employer's goods by truck over the public highway, the employer is not liable for the contractor's failure to inspect the brakes on his truck, or for his driving in excess of the speed limit, because the risk is in no way a peculiar one, and only an ordinary precaution is called for. But if the contractor is employed to transport giant logs weighing several tons over the highway, the employer will be subject to liability for the contractor's failure to take special precautions or anchor them on his trucks.' " (*Teichert, supra,* 179 Cal.App.3d at p. 662, fn. omitted.) Thus, the court concluded, "[Driver's] negligence, if any, entailed nothing more than ordinary failure to exercise due care in the operation of a motor vehicle. This is not sufficient to invoke the 'special risk' exception to the rule of nonliability for the negligence of an independent contractor." (*Id.* at p. 661.)

Most recently, in *American States Ins. Co. v. Progressive Casualty Ins. Co.* (2009) 180 Cal.App.4th 18 [102 Cal.Rptr.3d 591], a self-employed trucker was driving a tractor-trailer into the only entrance to a construction site when the rear portion of his trailer ran over the plaintiff, severely injuring both of his legs. The plaintiff sued the trucker, the owner of the trailer, the grading contractor on the construction project, the general contractor, and the developer. The defendants tendered the suit to various insurance companies; one such insurer sought summary judgment, asserting that it owed the defendants no duty to defend because, among other things, the defendants were not potentially vicariously liable for the trucker's negligence under the doctrine of peculiar risk. (*Id.* at pp. 23–24.) The trial court granted the motion, concluding that as a matter of law the peculiar risk doctrine did not apply, and the Court of Appeal reversed. (*Id.* at p. 25.) It explained that unlike the accident in *Teichert,* where a bicyclist riding along the shoulder of a road "simply collided with a dump truck turning left," in the present case there was evidence "that Meza/Western's trailer (bottom-dump dirt hauler) collided with [the plaintiff] while accessing the Vinci parties' Project entrance, a lone entrance which required Meza/Western 'to execute a [U]-turn (driving westbound in eastbound lanes), encroach on at least two pedestrian cross walks

[*sic*], jump a curb, and drive across a sidewalk . . . , all without assistance of . . . flagmen.' " (*Id.* at p. 31.) Thus, the court concluded, "*Teichert* is not the exemplar in this regard. *Castro* is." (*Ibid.*)

### C. As a Matter of Law, the Peculiar Risk Doctrine Does Not Apply to the Present Case

Taken together, the four cases discussed above suggest that the dispositive issue for purposes of applying the peculiar risk doctrine to the present case is whether there was a direct relationship between the accident and the "particular work performed" by Wyatt. (*Teichert, supra,* 179 Cal.App.3d at p. 662.) In other words, if the "character" of the work contributed to the accident, the peculiar risk doctrine applies. If the accident resulted from "ordinary" use of the vehicle, the peculiar risk doctrine does not apply, notwithstanding the vehicle's size and weight.

We conclude that the present case is of the latter kind. As the City correctly points out, there was no direct relationship between any risk inherent in hauling asphalt and the accident. At the time of the accident, Wyatt's truck was unladen and Wyatt had left the jobsite. He was not engaged in hauling or dumping asphalt nor, as in *Castro,* was he following a plan of work dictated by his hauling duties. Instead, Wyatt was simply traveling from a jobsite on ordinary city streets. Although it indisputably had catastrophic consequences, Wyatt's negligence—running a stop sign—thus "entailed nothing more than [the] ordinary failure to exercise due care in the operation of a motor vehicle." (*Teichert, supra,* 179 Cal.App.3d at p. 661.)

Bowman contends that, notwithstanding the foregoing, *Anderson, supra,* 276 Cal.App.2d 436, discussed above, supports the application of the peculiar risk doctrine here because "[t]he *Anderson* court found a peculiar risk of harm on the basis of a state administrative regulation—the Division of Industrial Safety's Construction Safety Order 1576(e)—which required a truck with a body capacity of two and a half cubic yards or more used to haul construction materials to have a back-up warning device." Thus, he urges, "the evidence that trucks with the size and weight of Wyatt's create a peculiar risk of harm requiring special precautions lies in the relevant California statutes and regulations, and in the [Bulletins for Contract Trucks] issued by the Los Angeles Bureau of Street Services."

We do not agree. While the *Anderson* court discussed the state administrative regulation to which Bowman refers, it did so in the context of an allegedly erroneous negligence per se instruction. (*Anderson, supra,* 276 Cal.App.2d at pp. 439–440.) The court did *not* address the regulation in

discussing peculiar risk. (*Id.* at pp. 445–446.) We thus conclude that the alleged regulatory violations to which Bowman refers are irrelevant to the issue of peculiar risk.

Based on our analysis, we conclude as a matter of law that the work in which Wyatt and the dump truck were engaged at the time of the accident did not constitute a peculiar risk. Thus, the trial court erred in submitting the issue of peculiar risk to the jury.

III. *The Dangerous Condition of Public Property Claim Was Not Supported by Subsantial Evidence*

Bowman asserted at trial that the City was liable for his injuries pursuant to Government Code section 835 (the dangerous condition claim). Section 835 provides that a public entity is liable for injury caused by a dangerous condition of its property (here, the dump truck) if the plaintiff establishes that "the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." A " '[d]angerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (Gov. Code, § 830, subd. (a).) " 'Property of a public entity' and 'public property' mean real or personal property owned or controlled by the public entity . . . ." (§ 830, subd. (c).)

The City contends that the jury's verdict for Bowman on the dangerous condition claim is not supported by substantial evidence. Specifically, it contends that substantial evidence did not support the jury's finding that defects in the dump truck's braking system were a proximate cause of the accident and Bowman's injuries. For the reasons that follow, we agree.

A. *The Brakes Evidence*

Through several witnesses, Bowman introduced evidence of deficiencies in the dump truck's brakes. Dale Washburn, a police officer, testified that immediately after the accident the truck's air brakes did not hold any air pressure, one brake was out of compliance, and there were audible air leaks

throughout the truck. When Washburn examined the truck the next morning, the air pressure gauges registered "zero," there was a rapid loss of air pressure in the braking system, the air reservoir tanks contained excessive water, and there was possible dirt contamination of one of the truck's axles. Plaintiff's investigator, Alan Coulter, testified that the truck's front brakes had been disconnected and that disabling the truck's front brakes would have diminished braking ability.

The cited evidence unquestionably is substantial evidence of brake defects after the accident. The question relevant to our inquiry, however, is not whether there was substantial evidence of brake defects, but instead whether there was substantial evidence that alleged brake defects were a proximate cause of the accident. (Gov. Code, § 835.) As relevant to that issue, the testimony was as follows.

*Meredith Kussin*: Kussin was an eyewitness to the accident. She first saw the dump truck one or two seconds before the accident. She did not see it cross the limit line, and she does not know whether it stopped prior to entering the intersection.

*Randy Aleman*: Aleman was an eyewitness to the accident. He was traveling directly behind Bowman immediately before the accident. Aleman saw Wyatt "look[] to the right, meaning south side, right away, but then he looks toward me. The bike was already coming, and I saw that he looked at me. He'd missed the policeman [Bowman] that was coming and he was still rolling." Wyatt "was going very slowly, just moving slowly. I know he saw me. He didn't see the cop [Bowman]." Bowman tried to swerve to avoid the accident, but "when he tried to swerve, the truck shook up" as Wyatt accelerated into a left turn.

*Brett Llewellyn*: Llewellyn was an eyewitness to the accident. He saw Wyatt's truck slowly roll through the intersection without stopping.

*Alan Coulter*: Coulter was an investigator hired by Bowman. He testified to multiple defects in the truck's braking system, but said that he could not determine "whether the brake system stopped the vehicle and/or how the brake system affected the ability of this vehicle to stop." He also did not know how the removal of the front brakes might have affected the truck's ability to stop. He did not have an opinion as to whether or not the brakes stopped the truck, and he could not opine that the truck's brakes failed.

*Tommie Wyatt*: Wyatt testified that he stopped at the limit line and then inched into the intersection, but that he never saw Bowman's motorcycle approaching him. He said that he "felt a bump, and . . . thought, wow, what is

that?" It was not until he got out of the truck and saw Bowman and the motorcycle that he realized what had happened. He said that he never had had any trouble stopping his truck, including on the day of the accident.

### B. The Jury's Finding That Defective Brakes Were a Proximate Cause of the Accident Is Not Supported by Substantial Evidence

The City contends that the evidence cited above is not of sufficient substantiality to support the jury's finding that defective brakes caused the accident. To establish causation, a plaintiff must prove that the defendant's conduct was a "substantial factor" in bringing about his or her harm. (*Padilla v. Rodas* (2008) 160 Cal.App.4th 742, 752 [73 Cal.Rptr.3d 114] (*Padilla*); see *Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 132 [39 Cal.Rptr.2d 658].) Stated differently, evidence of causation "must rise to the level of *a reasonable probability based upon competent testimony*. [Citations.] 'A possible cause only becomes "probable" when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action.' [Citation.] The defendant's conduct is not the cause in fact of harm ' "where the evidence indicates that there is less than a probability, i.e., a 50-50 possibility or a mere chance," ' that the harm would have ensued." (*Williams v. Wraxall, supra,* at p. 133, italics added.)

In reviewing evidence of causation, "we consider both direct and circumstantial evidence, and all reasonable inferences to be drawn from both kinds of evidence, giving full consideration to the negative and affirmative inferences to be drawn from all of the evidence, including that which has been produced by the defendant." (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 483 [50 Cal.Rptr.2d 785] (*Leslie G.*).) We cannot, however, draw inferences "from thin air." (*Ibid.*) As one court has explained, "Where . . . the plaintiff seeks to prove an essential element of [his] case by circumstantial evidence, [he] cannot recover merely by showing that the inferences [he] draws from those circumstances are consistent with [his] theory. Instead, [he] must show that the inferences favorable to [him] are more reasonable or probable than those against [him]." (*Ibid.,* italics omitted.)

In the present case, Bowman did not introduce any direct evidence that faulty brakes caused the collision. Instead, he asked the jury to infer from the brake defects discovered after the accident that defects existed before the accident and were the accident's cause. To affirm the jury's finding, we therefore must conclude that the evidence established more than a *possibility* that the brakes failed and caused the collision; rather, we must conclude that it is *probable* that they did so.

Having reviewed the entire record, we cannot conclude that the jury's finding that brake defects caused the accident is supported by substantial

evidence. No witness testified that he or she saw Wyatt trying to brake to avoid the collision, and the single eyewitness who testified to the cause of the accident said that Wyatt did not see Bowman approaching the intersection because "[Bowman] was too close." This statement was consistent with Wyatt's testimony that he did not see Bowman prior to the impact, and that it was not until he got out of his truck and saw Bowman and the motorcycle that he realized that he and Bowman had collided. There was no evidence of physical indicia that Wyatt was trying to stop, such as skid marks or witness testimony of squealing brakes immediately before the collision. Finally, Bowman's expert witness did not testify that defective brakes caused the accident; to the contrary, while he testified to a host of defects, he was unwilling to say that brake failure caused the accident or even that a brake defect affected Wyatt's ability to stop.

The present case thus is analogous to *Padilla, supra*, 160 Cal.App.4th 742. There, a two-year-old child drowned in the defendant's backyard pool when his mother left him unattended for about five minutes. The mother brought an action for negligence against the homeowners, asserting, among other things, premises liability based on an allegedly defective gate. The trial court granted the homeowners' summary judgment motion, in part on the ground that the mother could not establish that the absence of a self-locking gate at one entrance to the pool area was a cause of the accident because it was speculative as to whether the child entered the pool area through the gate or through one of the other points of access to the pool. (*Id.* at p. 745.) The Court of Appeal affirmed, finding that even if it assumed that the gate was defective for lack of a self-latching mechanism, the mother could not establish causation. It explained: "With the evidence viewed most favorably to [mother], she is unable to show that it was more probable than not that a self-latching gate would have prevented Eddie's drowning. The probabilities are evenly balanced as to whether Eddie gained entrance to the pool through the side yard gate, the 'door' on the other side of the house, or the sliding glass doors of the house. Accordingly, [mother] cannot establish that Defendants' failure to provide a self-latching gate was a substantial factor in causing Eddie's drowning." (*Id.* at pp. 752–753.)

The present case also is analogous to *Leslie G., supra*, 43 Cal.App.4th 472. There, a woman was sexually assaulted in the parking garage of her apartment building. She sued the building's owners, contending they were negligent because they failed to repair a broken security gate and that their negligence caused her assault. The trial court granted the owners' motion for summary judgment, and the Court of Appeal affirmed. (*Id.* at p. 476.) It explained that because there was no direct evidence either that the rapist ·entered or departed through the broken gate or that the broken gate was the only way that he could have entered or departed, the plaintiff could not survive summary judgment simply because it was "*possible* that he *might*

have entered through the broken gate." (*Id.* at p. 483.) It said: "In this case, no one (other than the rapist, who has never been caught) knows how the rapist got into or out of the garage. Although the three access doors to the garage were found closed on the day after Leslie's rape, no one knows whether they were closed or propped open on the night of the rape. No one knows whether the rapist followed another tenant in through the front door and then found his own way down to the garage. No one knows whether the rapist somehow obtained a key to the premises (he could have found a lost key or stolen one from another tenant). These unknowns are significant because, had the gate been operating properly, the rapist still could have entered the garage. Moreover, even if it had been working, he could have entered through the security gate itself by waiting outside for a car to enter, ducking beneath the closing gate, and hiding in the garage as he apparently did on the night of Leslie's rape. [Citations.] [¶] In short, there simply is no evidence from which to infer causation." (*Id.* at pp. 483–484, fn. omitted.)

In the present case, as in *Padilla* and *Leslie G.*, there is simply no evidence from which to infer that defendants' conduct was a cause of plaintiff's harm. Although proof of causation may be by circumstantial evidence, it must be by " 'substantial' evidence, and evidence 'which leaves the determination of these essential facts in the realm of mere speculation and conjecture is insufficient.' (*Showalter* v. *Western Pacific R. R. Co.* (1940) 16 Cal.2d 460, 471 [106 P.2d 895]; see also Prosser & Keeton, Torts (5th ed. 1984) § 41, p. 269 [a mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to determine the issue in favor of the defendant as a matter of law].)" (*Leslie G., supra*, 43 Cal.App.4th at p. 484.) Here, there simply was not evidence from which a reasonable jury could have concluded that defective brakes, rather than Wyatt's failure to see Bowman approaching the intersection, was the probable cause of the accident. Thus, Bowman's dangerous condition claim necessarily fails.

IV. *Substantial Evidence Did Not Support the Jury's Finding That the City Failed to Inspect or Maintain the Dump Truck's Brakes*

Bowman asserted at trial, and the jury concluded, that the City "faile[ed] to inspect or maintain the brakes of the truck it leased from Tommie Wyatt." The City challenges this finding on the same ground on which it challenges the dangerous condition claim—i.e., that substantial evidence did not support the jury's finding that the condition of the dump truck's brakes was a

substantial factor in causing the accident and plaintiff's harm. For the following reasons, we agree.

The jury was instructed on two separate legal theories relevant to the brakes claim. The first theory, breach of a mandatory duty, was premised on Government Code section 815.6. That section provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." The jury was instructed about a number of statutes and regulations pursuant to which the City assertedly had a "mandatory duty" to maintain the dump truck's brakes.[10] As to each alleged breach of a statutory duty, the jury was told that: "To establish this claim, plaintiff must prove all

---

[10] The jury was instructed pursuant to CACI No. 423 that it must consider whether the City violated Government Code section 815.6 "mandatory duties" created by a number of statutes and regulations. Those statutes and regulations, as described to the jury, are:

(1) Vehicle Code section 26453: "All brakes and component parts thereof shall be maintained in good condition and in good working order. The brakes shall be so adjusted as to operate as equally as practicable with respect to the wheels on opposite sides of the vehicle."

(2) Vehicle Code section 26454: "The service brakes of every motor vehicle shall be adequate to control the movement and to stop and hold such vehicle under all conditions of loading on any grade on which it is operated."

(3) Vehicle Code section 26502, subdivision (a): "Air brakes of every motor vehicle shall be so adjusted and maintained as to be capable of providing full service brake application at all time. A full service brake application shall deliver all brake chambers not less than 90 percent of the air reservoir pressure remaining with the brakes applied."

(4) Vehicle Code section 34501.12: "[(c)]: Each motor carrier who in this state directs the operation of or maintains any vehicle of a type described in subdivision (a) shall designate one or more terminals, as defined in section 34515, in this state where vehicles can be inspected by the department pursuant to paragraph 4 of subdivision (a) of section 24501, and where vehicle inspection and maintenance records and driver records will be made available for inspection. [(d)]: The department shall inspect at least every 25 months every terminal, as defined in section 34515, of any motor carrier who at any time operates any vehicle described in subdivision (a). [(e)]: It is the responsibility of the motor carrier to schedule with the Department the inspection required by subdivision (d). The motor carrier shall submit an application form supplied by the department accompanied by the required fee. [(f)]: It is unlawful for a motor carrier to operate a vehicle subject to this section without having submitted an inspection application and the required fees to the Department as required by subdivision (e) or (h). [(g)]: It is unlawful for a motor carrier to operate a vehicle subject to this section after submitting an inspection application to the Department without the inspection described in subdivision (d) having been performed and a safety compliance report having been issued to the motor carrier within the 25-month inspection period or within 60 days immediately preceding the inspection period."

(5) Vehicle Code section 34505.5: "Every motor carrier operating a motor truck of three or more axles that are more than 10,000 pounds gross vehicle weight rating shall, as part of the systematic inspection, maintenance and lubrication service required of all motor carriers, require the vehicle or vehicles for which it is responsible to be inspected at least every 90 days. The inspection shall include, but not be limited to, all of the following: brake adjustment,

of the following: Number one, that the City of Los Angeles violated [the identified statute or regulation]; number two, that plaintiff was harmed; and number three, that the failure of the City of Los Angeles to perform its duty was a substantial factor in causing plaintiff's harm."

 The second theory asserted relevant to the brakes claim was the breach of a nondelegable duty. Nondelegable duties "derive from statutes (*Maloney* v. *Rath* [(1968)] 69 Cal.2d [442,] 448 [71 Cal.Rptr. 897, 445 P.2d 513])[,] contracts (*Harold A. Newman Co.* v. *Nero* (1973) 31 Cal.App.3d 490, 496–497 [107 Cal.Rptr. 464]; *Capitol Chevrolet Co.* [*v. Lawrence Warehouse Co.* (9th Cir. 1955)] 227 F.2d [169,] 173), and common law precedents. (*Maloney, supra*, 69 Cal.2d at p. 447.)" (*Barry* v. *Raskov* (1991) 232 Cal.App.3d 447, 455 [283 Cal.Rptr. 463].) They "do not rest upon any personal negligence of the employer. They are rules of vicarious liability, making the employer liable for the negligence of the independent contractor, irrespective of whether the employer has himself been at fault. They arise in situations in which, for reasons of policy, the employer is not permitted to shift the responsibility for the proper conduct of the work to the contractor. The liability imposed is closely analogous to that of a master for the negligence of his servant. [¶] The statement commonly made in such cases is that the employer is under a duty which he is not free to delegate to the contractor. Such a 'non-delegable duty' requires the person upon whom it is imposed to answer for it that care is exercised by anyone, even though he be an independent contractor, to whom the performance of the duty is entrusted." (Rest.2d Torts, § 415, introductory note to ch. 15, topic 2.) The jury was instructed that the City had a nondelegable duty to maintain the dump truck's brakes under a variety of statutes and regulations.[11]

---

brake system components and leaks, steering and suspension systems. No vehicle . . . subject to this section shall be operated on the highway, other than to a place of repair, until all defects listed during the inspection . . . have been corrected."

(6) Title 13, California Code of Regulations, section 1232 and 49 Code of Federal Regulations (2009): "[F]or the preventative maintenance of brakes required of motor carriers, . . . the City must insure that individual brake inspectors performing the brake inspections must be qualified as follows: (d)(1), understands the brake service or inspection task to be accomplished and can perform that task; (d)(2), is knowledgeable of and has mastered the methods, procedures, tools and equipment used when performing an assigned brake service or inspection task; and (d)(3), is capable of performing the assigned brake service or inspection by reason of experience, training or both . . . ."

[11] The jury was given a series of "nondelegable duty" instructions, patterned on CACI No. 3713, as follows:

"Vehicle Code 26453 states—we're back to Vehicle Codes, not for too much longer, though. Bear with me. All brakes and component parts thereof shall be maintained in good condition and in good working order. The brakes shall be so adjusted as to operate as equally as practicable with respect to the wheels on opposite sides of the vehicle. If plaintiff proves that Wyatt did not comply with this law, then the City of Los Angeles is responsible for any harm caused by this failure unless the City of Los Angeles proves both of the following: [1], that it

■ Both breach of mandatory duty and breach of nondelegable duty claims have a causal element. That is, to find the City liable for breach of a mandatory duty or of a nondelegable duty, the jury had to find that the alleged breach of duty caused Bowman's injuries. (*Guzman v. County of Monterey* (2009) 178 Cal.App.4th 983, 991 [100 Cal.Rptr.3d 793] ["[T]here are three elements to a cause of action under Government Code section 815.6. First, the enactment at issue must be obligatory, not merely discretionary or permissive in its directions to the public entity. [Citation.] Typically, an enactment imposing a mandatory duty also includes specific rules and guidelines for implementation. Second, the duty imposed must be designed to protect against the particular kind of injury the plaintiff suffered. . . . The third and final requirement is that the breach of the duty must have been a *proximate cause* of the plaintiff's injury." (italics added)]; *Madden v. Summit View, Inc.* (2008) 165 Cal.App.4th 1267, 1281 [81 Cal.Rptr.3d 601] [to establish breach of a nondelegable duty, plaintiff must prove "a causal relationship between his injuries and [the defendant's] asserted omission"].)

For all of the reasons discussed in the prior section, there was not substantial evidence that alleged defects in the dump truck's brakes caused plaintiff's injuries. Accordingly, plaintiff's brakes claim necessarily fails.

V. *The City Was Not the Dump Truck's Motor Carrier As a Matter of Law*

The City contends that the trial court erred in instructing the jury that the City was the dump truck's "motor carrier" as a matter of law. That contention is relevant to the dangerous condition claims and the brakes claim; therefore,

---

did what would be expected of a reasonably careful person acting under similar circumstances who wanted to comply with this law; and [2], that the failure to comply with this law was not due to Wyatt's negligence.

"These may all sound similar, but right now I'm giving you jury instructions relating to what's referred to as nondelegable duty.

"Next. Vehicle Code section 26454(a) states, the service brakes of every other vehicle shall be adequate to control the movement of and to stop and hold such vehicle under all conditions of loading. If plaintiff proves that Wyatt did not comply with this law, then the City of Los Angeles is responsible for any harm caused by this failure unless the City of Los Angeles proves both of the following: [1], that it did what would be expected of a reasonably careful person acting under similar circumstances who wanted to comply with this law; and [2], that the failure to comply with this law was not due to Wyatt's negligence.

"Vehicle Code section 26502(a) states, quote, Air brakes of every motor vehicle shall be so adjusted and maintained as to be capable of providing full service brake application at all time. A full service brake application shall deliver all brake chambers not less than 90 percent of the air reservoir pressure remaining with the brakes applied. If plaintiff proves that Wyatt did not comply with this law, then [the] City of Los Angeles is responsible for any harm caused by this failure unless the City of Los Angeles proves both of the following: [1], that it did what would be expected of a reasonably careful person acting under similar circumstances who wanted to comply with this law; and [2], that the failure to comply with this law was not due to Wyatt's negligence."

having concluded that those claims fail for lack of substantial evidence of causation, we need not reach the motor carrier issue to resolve this appeal. However, because the motor carrier issue was a significant issue at trial and because our conclusions will compel a retrial, we discuss the motor carrier issue for the guidance of the parties and trial court.

### A. Overview of Motor Carrier Issue

The Vehicle Code requires the California Highway Patrol (CHP) to "regulate the safe operation of" large vehicles, including trucks with three or more axles that weigh more than 10,000 pounds. (Veh. Code, § 34500, subd. (a).) The CHP complies with this mandate, in part, through the "Biennial Inspection of Terminals Program" (BIT). Pursuant to the BIT, a vehicle's "motor carrier" must schedule a vehicle inspection by the CHP at least every 25 months, and the motor carrier may not operate the vehicle without the CHP inspection having been performed and a safety compliance report having been issued. (Veh. Code, § 34501.12, subds. (d)(1), (e)(1), (g)(1).)

In most cases, the "motor carrier" is "the registered owner of a vehicle." As relevant to the present case, however, if the registered owner "leases the vehicle to another person for a term of more than four months," then "the lessee is the motor carrier." (Veh. Code, § 34501.12, subd. (a), (a)(1).)

It was undisputed at trial that the dump truck was subject to the BIT requirement and that Wyatt was the "registered owner" of the truck. The City therefore contended that Wyatt was the dump truck's motor carrier. Plaintiff conceded that Wyatt was the registered owner of the dump truck, but he contended that the City had leased the dump truck from Wyatt for a period of 12 months and, accordingly, was the motor carrier.

The trial court stated initially that it would let the motor carrier issue go to the jury. Hence, a great deal of testimony was elicited regarding whether the City had leased the truck from Wyatt and, if so, for what period of time. Ultimately, however, the court took the issue from the jury, deciding that the City was the motor carrier as a matter of law because there was no factual dispute that the contract between Wyatt and the City was for more than four months. The court so instructed the jury, telling it as follows: "After hearing all the evidence, I determined as a matter of law that the City was a motor carrier because I found that there was really no dispute over the key issue. And the key issue is—and just so you all understand it—Vehicle Code 34501.12, and that's considered in conjunction with two other Vehicle Code sections, 34505.5 and 34505.6. And the key issue was that the Vehicle Code section—pertinent section under 34501.12 says in defining a motor

carrier, . . . if a registered owner leases the vehicle to another person for a term of more than four months . . . the lessee is the motor carrier. That's the statute that I am finding—using to find as a matter of law that the City was the motor carrier. And the court found no dispute between the parties about whether the lease was for more than four months."

The City challenges the trial court's determination that the City was the motor carrier as a matter of law (the motor carrier determination), urging that it was a matter of dispute whether the City leased Wyatt's truck for more than four months. It contends that although the contract between it and Wyatt was for one year, the contract did not provide for a "lease" of Wyatt's truck, and hence it could not have been the truck's motor carrier. Bowman disagrees, asserting that "there was little conflict in the evidence" relevant to the motor carrier issue, and thus the trial court properly resolved it as a matter of law.

We review in the next section the evidence relevant to the motor carrier determination. Based on this evidence, we then conclude that the trial court erred in finding that the City was the motor carrier as a matter of law.

B. *Facts Relevant to the Motor Carrier Issue*

1. *The Contract*

As we have said, whether Wyatt or the City was the motor carrier turns on whether Wyatt "lease[d] the [dump truck] to [the City] for a term of more than four months." (Veh. Code, § 34501.12, subd. (a)(1).) The relationship between Wyatt and the City was governed by a lengthy written contract, and thus we begin with the relevant contractual language.

The contract defined its purpose as "the day-to-day rental and operation of privately owned dump trucks furnished with driver and necessary equipments [*sic*] for hauling purposes." It began with a series of recitals that explained the parties' intent in entering the contract:

"Whereas, the CITY, in order to discharge certain duties and responsibilities in connection with hauling asphalt, rubbish, tree trimmings and other materials, requires the day-to-day use of dump trucks for such purposes under the direction of the Department of Public Works, Bureau of Street Services, or the authorized representative; and

"Whereas, the INDEPENDENT CONTRACTOR is willing to furnish and rent a dump truck for such purposes; and [¶] . . . [¶]

"Whereas, the nature of this work is of an occasional character, NOW, THEREFORE, THE INDEPENDENT CONTRACTOR hereby makes the following AGREEMENT with the CITY OF LOS ANGELES . . . ."

The contract "ha[d] a term of one-year from July 1, 2004 to June 30, 2005." It provided that Wyatt "from time to time as directed by the Bureau of Street Services will furnish his/her own dump truck for the transportation of various inert matter from place to place . . . ." It further stated the City would provide, "in each request for dump trucks used, the Independent Contractor with the necessary information as may be reasonably required by the Independent Contractor to comply with each said request."

The contract allocated responsibility for BIT inspections to Wyatt, as follows: "The operation, transportation, maintenance and Biennial Inspection of Terminals required by the California Vehicle Code (CVC) is the sole responsibility of the Independent Contractor and at no time the cost or expense of the CITY. In addition, the acquisition and maintenance of truck equipment required by the Bureau of Street Services is the sole responsibility of the Independent Contractor and at no time the cost or expense of the CITY."

The contract was supplemented by a series of "Bulletins for Contract Trucks" (BCT's), with which Wyatt agreed to comply. One such BCT provided that, "The Department of Public Works will rent privately owned and operated dump trucks in accordance with the Standard Contractual Agreement of the City of Los Angeles for the rental and operation of dump equipment." Another provided that, "The Owner-Operator's signature on the Contractual Agreement . . . carries the commitment for the utilization of his/her truck for the contract period. The use of the Contractor[']s truck for the Bureau's Contract Truck Program shall be available during any given eight (8) hour shift as needed by the CITY. The CITY has the right of first refusal." And, another provided as follows: "The Bureau of Street Services has determined that all Contract Truck Owner-Operators must obtain (a) the current Biennial Inspection Terminal (BIT) certificate every two (2) years, and (b) a Commercial Vehicle Safety Association (CVSA) sticker every ninety (90) days, or more often if necessary, to insure safe operation. [¶] According to the California Vehicle Code (CVC), Division 14.8, Section 34501.12, the *City of Los Angeles* qualifies as a 'motor carrier' (or as 'lessee' based on the intent expressed in the Board-approved 'Procedures for Renting Privately Owned Dump Trucks'). Therefore, when the City/Bureau of Street Services rents Owner-Operator trucks that work exclusively under the authority and direction of the Bureau of Street Services for more than a four-month period, the City/Bureau is the 'motor carrier' and as such has the responsibility to require Owner-Operators to obtain current BIT and CVSA certificates. All certificates are obtained at the expense of the Owner-Operator."

### 2. Trial Testimony

Although it was disputed at trial whether the City "leased" Wyatt's truck, there was much about the relationship between Wyatt and the City that was not in dispute. This included the following:

—Wyatt worked for the City on an as-needed basis. Accordingly, although the contract term was one year, Wyatt did not necessarily work for the City every day of the year. Rather, he worked for the City only on those days when the City had work for him to do.

—During the contract period, Wyatt, not the City, "control[led]" the truck.

—Wyatt was free during the contract period to take other trucking jobs once he was "off the clock" with the City or if the City did not have work for him. During the 10 to 15 years that he worked under City contracts, he took trucking jobs for entities other than the City.

—The City was not permitted under the contract to drive Wyatt's truck; only Wyatt was permitted to do so. Thus, if Wyatt was unavailable to drive the truck, the City did not provide an alternative driver.

—Wyatt was required under the terms of the contract to maintain the truck.

—During the contract period, Wyatt paid for the truck's gas and oil and for all necessary repairs.

### 3. As a Matter of Law, the City Did Not "Lease" the Dump Truck for a Term Exceeding Four Months

Much of the testimony at trial concerned whether Wyatt and various City employees believed that the City "rented" Wyatt's dump truck. Because this testimony was in conflict—some witnesses testified that Wyatt rented the truck to the City, while others testified that he did not[12]—the City contends that the trial court should not have taken the issue from the jury. Bowman contends otherwise: He suggests that the testimony on which the City relies is

---

[12] For example, Veronica Maxwell, the City's contract truck coordinator, was asked, "Didn't the City rent Mr. Wyatt's truck for the period of the contract?" She answered, "Yes." The following day, however, she testified that "[T]he truck is not actually rented. It's an offer of work where the contractor asks the City, do they have work available." She subsequently stated that the City "rented the truck" and was the "lessee or rentee." Marion Chapman, a superintendent for the City of Los Angeles, Bureau of Street Services, said that his understanding was that the City did not rent the dump truck from Wyatt, and that if Maxwell had said so, "[s]he's incorrect." Wyatt testified that he "rented" his truck to the City, but that he did not believe that by doing so, the City became the motor carrier.

extrinsic evidence that is irrelevant to the dispute because it tends to prove a meaning of the contract to which its plain language is not reasonably susceptible. In other words, Bowman says, "[T]he testimony of City employees did not even purport to provide an interpretation of the contract language to which it was 'reasonably susceptible.' It simply contradicted the contract language, flatly asserting, contrary to the contract's repeated statements that the City was 'renting' Wyatt's truck, that the truck 'wasn't rented.' "

With due respect to the contentions of the parties, we believe that the witnesses' beliefs about the proper characterization of the relationship between the City and Wyatt (or, more properly, the City and Wyatt's truck) is beside the point for purposes of the present dispute. While the parties' understanding of their relationship would be relevant to a breach of contract action between Wyatt and the City, it is not relevant to determining the City's liability to a third party. Instead, the relevant question is whether the contractually created relationship between the City and Wyatt's truck constituted a "lease" relationship within the meaning of the motor carrier statute. We therefore turn to that issue.

As we have said, Vehicle Code section 34501.12 provides that if the registered owner of a large truck "leases" the truck to another person for a term of more than four months, the lessee is the motor carrier. (*Id.*, subd. (a)(1).) Although the existence (or nonexistence) of a long-term "lease" therefore is critical to identifying the motor carrier, section 34501.12 does not define what a lease is. Other sections of the Vehicle Code define the terms "lessee" and "lessor," but they do not shed light on the present dispute. Pursuant to Vehicle Code section 371, "lessee" "includes 'bailee' and is a person who leases, offers to lease, or is offered the lease of a motor vehicle for a term exceeding four months." A "lessor" is "a person who, for a term exceeding four months, leases or offers for lease, negotiates or attempts to negotiate a lease, or induce any person to lease a motor vehicle; and who receives or expects to receive a commission, money, brokerage fees, profit or any other thing of value from the lessee of said vehicle. 'Lessor' includes 'bailor' and 'lease' includes 'bailment.' " (Veh. Code, § 372.) These definitions thus incorporate the four-month provision of section 34501.12, but they do not identify the fundamental attributes of a lease.

We turn therefore to the dictionary and to cases defining "lease" in other contexts. Black's Law Dictionary defines "lease" as the "grant[ing] [of] possession and use of (land, buildings, rooms, movable property, etc.) to another in return for rent or other consideration" or "[a] contract by which a rightful possessor of real property conveys the right to use and occupy that property in exchange for consideration, usu[ally] rent." (Black's Law Dict. (7th ed. 1999) p. 900, col. 1, p. 898, col. 1.) The right to "possession and

use" or to "use and occupy" property is thus, essential to the existence of a lease according to these definitions.

Cases arising in nonvehicle contexts also emphasize that the right to possession is critical to the existence of a lease. For example, in *San Jose Parking, Inc. v. Superior Court* (2003) 110 Cal.App.4th 1321 [2 Cal.Rptr.3d 505], the court considered whether a contract between a redevelopment agency and a parking company constituted a "lease." The court concluded that it did not, explaining that because the parking company was required to provide reasonable access for pedestrian customers of the adjacent property owners and to maintain the preexisting monthly parking spaces on the lot, "the Agreement does not embody ' "[t]he distinguishing characteristics of a leasehold estate . . . that the lease gives the lessee *the exclusive possession of the premises* against all the world, including the owner [citation], . . . [Citation.]" [Citation.]' (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 32 [31 Cal.Rptr.2d 378], quoting *Howard v. County of Amador* (1990) 220 Cal.App.3d 962, 972 [269 Cal.Rptr. 807].)" (*San Jose Parking, Inc. v. Superior Court, supra*, 110 Cal.App.4th at p. 1328, italics added.)

The court similarly concluded in *Garcia v. Halsett* (1970) 3 Cal.App.3d 319 [82 Cal.Rptr. 420]. There, the plaintiff, a child, was injured at a launderette by a malfunctioning washing machine. He urged on appeal that the trial court erred by refusing to instruct the jury on the issue of bailment (i.e., lease) of the washing machine. The Court of Appeal disagreed, concluding that the facts did not establish a bailment of the washing machine as a matter of law. It explained: "In order to constitute a bailment, possession of the article bailed must be given or delivered to the bailee. [Citations.] [Plaintiffs] contend that [plaintiff] Arthur had at least constructive possession of the washing machine during the time he was using it. However, this argument is also without merit. [Plaintiff] Arthur assumed no responsibility for the safe-keeping of the machine, and did not have the right to remove it or tamper with the mechanical parts of the washer. [Plaintiff] merely acquired a license to use the washing machine and was not a bailee." (*Id.* at p. 324.)

Based on the foregoing, we conclude that the right to possession is a fundamental attribute of a lease or rental. (See also Civ. Code, § 1927 ["An agreement to let upon hire binds the letter to secure to the hirer the quiet possession of the thing hired during the term of the hiring, against all persons lawfully claiming the same."].) In the present case, it is undisputed that the City did not have the right to "possess" the dump truck. Both Wyatt and City representatives testified that the City was not permitted under the contract to drive Wyatt's truck; only Wyatt was permitted to do so. Thus, if Wyatt was unavailable to drive the truck, the City did not provide an alternative driver.

Further, the testimony was undisputed that Wyatt was free to take other trucking jobs once he was "off the clock" with the City or if the City did not have work for him, and Wyatt testified that during the 10 to 15 years that he worked under City contracts, he had taken trucking jobs for entities other than the City. Accordingly, the testimony was undisputed that the City did not have the right to possess the truck, much less to do so exclusively. As a matter of law, therefore, it was not the truck's "lessee."

Further, as discussed above, a vehicle's lessee is its "motor carrier" only if the lease term exceeds four months. (Veh. Code, § 34501.12.) In the present case, the trial court concluded that Wyatt was the motor carrier because it found no dispute between the parties "about whether the lease was for more than four months." The court based this conclusion on the fact that *the contract* between Wyatt and the City was for a period of more than four months. In other words, the court apparently concluded that because the contract was for a 12-month period, the lease term necessarily was also for 12 months. We do not believe, however, that the contract's language bears out the trial court's conclusion.

As we have noted, the contract defined its purpose as "the *day-to-day* rental and operation of privately owned dump trucks furnished with driver" and noted that the work for which the City required dump trucks was of "an occasional character." (Italics added.) It provided that Wyatt "from *time to time* as directed by the Bureau of Street Services will furnish his/her own dump truck for the transportation of various inert matter from place to place," and it characterized the City's right to the truck as one of "first refusal." (Italics added.) Thus, as we read the language of the contract, it did not provide for a one-year lease of the truck. Rather, it provided for "day-to-day" rental of the truck on an as-needed basis for one year.

Nothing in the testimony at trial suggests an alternative reading of the contractual language. To the contrary, City witnesses testified that because Wyatt's contract bound him to work for the City on an as-needed basis, he did not necessarily work for the City every day of the year. Instead, although the contract term was one year, Wyatt performed work for the City only on those days when the City requested his services.

Based on the language of the contract, considered in light of the extrinsic evidence offered at trial, we conclude as a matter of law that the City did not lease the dump truck from Wyatt for a term exceeding four months. The City therefore was not the dump truck's motor carrier.

## WYATT'S APPEAL

Wyatt contends that the trial court abused its discretion by (1) admitting evidence that his motor carrier permit had been suspended; (2) admitting lay opinion testimony; and (3) limiting the testimony of defendants' expert. For the reasons that follow, we conclude that there was no prejudicial error and affirm the judgment against Wyatt.

### I. *Admission of Evidence That Wyatt's Motor Carrier Permit Had Been Suspended*

Over Wyatt's objection, Bowman introduced evidence, which Wyatt disputed, that the Department of Motor Vehicles (DMV) had suspended Wyatt's motor carrier permit in April 2004 and had never reinstated it. The issue first was addressed in the examination of Veronica Maxwell, the City's contract truck coordinator. Bowman's counsel asked whether Maxwell was "aware that the [DMV] certified that Mr. Wyatt's motor carrier permit had been suspended in April 2004 and has never been unsuspended?" Maxwell testified that she was not aware, and agreed that it "would have been important" for her to have had that information. Counsel later showed Maxwell two letters from the DMV, one addressed to Wyatt and the other addressed to Bowman's counsel, which confirmed the suspension of Wyatt's motor carrier permit in April 2004. Maxwell agreed that the letters said that Wyatt's motor carrier permit had been suspended, and she stated that she had never seen the letters before and did not know whether Wyatt's motor carrier permit ever had been reinstated.

The suspension of Wyatt's motor carrier permit was raised again during Bowman's counsel's examination of Alan Coulter, who testified as an expert concerning inspection and maintenance requirements for large vehicles. Coulter testified that a current motor carrier permit is required to drive a large dump truck, and he said that he had contacted the DMV several times and had been told that Wyatt's motor carrier permit had expired and never had been renewed.

Wyatt also was asked about the suspension of his motor carrier permit. He testified that to his knowledge, his permit had never been suspended. He also testified about a document demonstrating that he had a valid motor carrier permit in June 2007.

After closing arguments, in which no party raised the permit suspension, the trial court admitted two documents relevant to the issue. The first, exhibit 86, was a letter from the DMV to Wyatt, dated April 3, 2004, stating that Wyatt's motor carrier permit was being suspended because Wyatt had not

provided the DMV with proof of liability insurance. The second, exhibit 87, was a letter from the DMV to Bowman's attorney, dated October 24, 2007, stating that Wyatt's motor carrier permit had been suspended on March 31, 2004, because his liability insurance had been cancelled. It further stated that Wyatt had never reinstated his permit and "[i]f Mr. Wyatt has been operating he has done so illegally because his valid permit was suspended." After admitting these documents, the court told the jury the following: "[Y]ou remember early on . . . I told you that you must not consider whether any of the parties in this case has insurance. The presence or absence of insurance is totally irrelevant and you must decide this case based only on the law and the evidence . . . . I am admitting into evidence two documents, exhibits 86 and 87[,] that reference insurance . . . . You may consider these two documents for the limited purpose of the issue of insurance as complying with a requirement, okay. But not generally. You cannot consider the issue of insurance in determining liability or damages . . . ."

Wyatt contends on appeal that evidence that his motor carrier permit had been suspended was irrelevant to any of the issues raised at trial and should not have been admitted. Further, he urges that this evidence was prejudicial because it suggested to the jury that he was a bad driver: "The evidence of the suspension undoubtedly impacted the jury, as it is easier to believe that a bad driver would not stop at a stop sign."

Bowman agrees that evidence of the alleged suspension of Wyatt's motor carrier permit was not relevant to his case against Wyatt, but urges that it was relevant to his case against the City—specifically, "to the issue of whether the City was meeting its responsibilities, as outlined in the BCT's [(Bulletins for Contract Trucks)] which were part of its contract with Wyatt." According to Bowman, the suspension of Wyatt's motor carrier permit "showed that the City was derelict in its responsibilities for Wyatt and his truck." Bowman also contends that the testimony was relevant to impeach Veronica Maxwell, who testified that she would not have renewed Wyatt's contract without a valid motor carrier permit, and Wyatt, who testified that he had a valid motor carrier permit at the time of the accident.

We agree with Wyatt that evidence that his motor carrier permit had been suspended was not relevant to any of the issues the parties raised at trial. The issue to which Bowman claims the evidence was relevant—whether "the City was meeting its responsibilities, as outlined in the BCT's"—is not an "issue" at all. As outlined by the jury instructions, the questions properly before the jury with regard to the City's liability were whether (1) the City failed to maintain the truck's brakes and faulty brakes caused the accident, *or* (2) Wyatt's negligence caused the accident and the City was vicariously liable

for Wyatt's negligence. The City's alleged failure to verify the status of Wyatt's motor carrier permit is manifestly irrelevant to any of these issues.[13]

 The alleged suspension of Wyatt's motor carrier permit also was not proper impeachment evidence. While Bowman is correct that a witness's credibility may be challenged by evidence relevant to "[t]he existence or nonexistence of any fact testified to by him" (Evid. Code, § 780, subd. (i)), this rule does not allow *irrelevant* evidence to be introduced under the guise of impeachment. As the courts have said, " '[C]ollateral and irrelevant matter[s] . . . may not be used for impeachment. . . . "[A] party cannot cross-examine his adversary's witness upon irrelevant matters, for the purpose of eliciting something to be contradicted." . . . " '[I]f a question is put to a witness on cross-examination which is collateral or irrelevant to the issue, his answer cannot be contradicted by the party who asked him the question . . . .' " ' " (*Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1033 [81 Cal.Rptr.3d 756] and cases cited therein.) Here, because the suspension of Wyatt's motor carrier permit was not relevant to any claim or defense, it also was not proper impeachment evidence.

Although we thus have concluded that the motor carrier permit evidence was irrelevant, its erroneous admission does not justify a reversal of the judgment against Wyatt unless " 'the admitted evidence should have been excluded on the ground stated and . . . the error or errors complained of resulted in a miscarriage of justice.' " (*People v. Earp* (1999) 20 Cal.4th 826, 878 [85 Cal.Rptr.2d 857, 978 P.2d 15].) " '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citations.]" (*People v. Callahan* (1999) 74 Cal.App.4th 356, 363 [87 Cal.Rptr.2d 838].)

Having reviewed the transcript of the entire trial, we cannot conclude that it is reasonably probable that a result more favorable to Wyatt would have been reached in the absence of the erroneous admission of the motor carrier permit evidence. As an initial matter, we do not agree with Wyatt that the jury was likely to have assumed that Wyatt was a bad driver because his motor carrier permit had been suspended, or that a person whose motor carrier permit had been suspended was less likely to have stopped at a stop sign. Further, in view of the court's instruction that the City, not Wyatt, was the motor carrier, it is unlikely that the jury attached any importance to the alleged suspension of Wyatt's motor carrier permit. Finally, although plaintiff sought to redact from exhibits 86 and 87 the reason for the alleged suspension of Wyatt's motor carrier permit, the court ultimately admitted the

---

[13] We do not opine as to whether this fact might be relevant upon retrial.

documents in unredacted form. These revealed to the jury that Wyatt's motor carrier permit was suspended because Wyatt's liability insurance allegedly had been cancelled, not because he was a poor driver. Accordingly, the jury had available to it the very information that Wyatt claims should have been admitted. For all of these reasons, the erroneous admission of evidence regarding Wyatt's motor carrier permit did not result in a miscarriage of justice.

## II. *Exclusion of Expert Witness Testimony*

Wyatt contends that the trial court erred in excluding some of the proffered expert testimony of Anthony Stein, a human factors and traffic safety expert. Defendants made an offer of proof that Stein intended to "offer an opinion about what [he] would expect the perception reaction time of the motorcyclist to be, and based on the research what [Stein] would expect him to do when faced with an emergency intrusion." Stein "would be offering an opinion [about] what [he] would expect of a normal motorcycle rider operating in a normal manner to do based on research about how motorcyclists behave." Further, Stein intended to "offer an opinion on . . . the research that shows the probability of detecting a motorcycle at various distances" and data from a "National Highway Traffic Safety Administration Report on [that issue]."

Based on this offer of proof, the trial court ruled as follows: "Mr. Stein may testify about perception and reaction time as long as it is limited to that. He's not allowed to testify as to how a normal person would have reacted. I think that is in the purview of the jury. The jury has to determine that from all the facts. I don't let any witness tell my jury how to decide the facts. And opinions, his opinions regarding the behavior of the plaintiff motorcyclist, I'm not going to allow that. That is for the jury to decide. I don't want testimony about what a normal motorcycle driver would have [done], and I don't want testimony included here about studies of people who think they have or have not seen motorcycles. All of these are issues for this jury to decide based on the facts of this case, and any such testimony would give an aura of expert opinion to the ultimate issues that they are to decide, and I am not going to allow that . . . ."

Wyatt asserts that it was an abuse of discretion to exclude Stein's testimony because it "would have assisted the jury in assessing the extent of comparative negligence, and to what extent Bowman may have been able to avoid impact while operating a motorcycle at the speed, and under the conditions at issue, on the type of motorcycle at issue." Further, Wyatt suggests, the testimony "would have aided the jury in assessing what a motorcycle driver could have done to avoid the accident, an assessment that the jury would necessarily need to decide to what extent Bowman may have been comparatively negligent."

 Wyatt has not demonstrated that the trial court abused its discretion by excluding Stein's testimony. "To preserve an evidentiary ruling for appellate review, the proponent of the evidence must make an offer of proof regarding the anticipated testimony. [Citation.] The offer of proof must address the 'substance, purpose, and relevance of the excluded evidence' (Evid. Code, § 354, subd. (a)), and must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued [citation]. The trial court may reject a general or vague offer of proof that does not specify the testimony to be offered by the proposed witness. [Citations.]" (*People v. Carlin* (2007) 150 Cal.App.4th 322, 334 [58 Cal.Rptr.3d 495]; see also *In re Mark C.* (1992) 7 Cal.App.4th 433, 444 [8 Cal.Rptr.2d 856] [failure to make an adequate offer of proof precludes consideration of the alleged error on appeal].)

Here, Wyatt failed to make an offer of proof that "set forth the actual evidence to be produced" and the " 'substance, purpose, and relevance of the excluded evidence.' " To make an offer of proof, Wyatt would have to have established that (1) percipient witnesses testified to the distance between Bowman and Wyatt when Wyatt first pulled into the intersection, and (2) the available research established that a reasonable motorcyclist traveling at the speed Bowman was traveling, at the distance Bowman was from Wyatt, under the conditions present immediately before the accident, would have been able to avoid hitting Wyatt's truck. Because Wyatt failed to do so, we cannot assess either the relevance or the prejudicial effect of the excluded evidence. (See *In re Mark C., supra*, 7 Cal.App.4th at p. 444 [trial court did not err in excluding expert's testimony regarding test results where party proffering expert stated only that he would testify to " 'some 33 standardized tests that were conducted' " but "this 'voluminous number' of tests was not described in any detail"].)

III. *Admission of Percipient Witness Opinion Testimony*

Wyatt contends finally that the trial court erred in admitting the opinion testimony of percipient witness Brett Llewellyn, as follows:

"Q From what you observed, did you see any way [Bowman] had an opportunity to avoid hitting that truck?

"A No."

Wyatt suggests that this testimony was inadmissible because it sought Llewellyn's opinion as to an ultimate issue—whether Bowman could have done anything to avoid the collision—rather than a description of what Llewellyn observed. Wyatt urges: "While Llewellyn may have been able to

provide a lay opinion as to the speed or the distance, he should not have been able to provide any opinion as to the ultimate conclusion of comparative negligence in this matter, whether Bowman could have exercised any care to have avoided . . . the accident."

We do not agree. The court addressed a similar issue in *Bouse v. Madonna Construction Co.* (1962) 201 Cal.App.2d 26 [19 Cal.Rptr. 823], where the plaintiff was injured when his car collided with another in a highway construction zone. The plaintiff sued the construction company, asserting that the "taper" that diverted traffic from one lane to another constituted a dangerous condition of which motorists did not have sufficient warning. (*Id.* at p. 27.) On appeal, the plaintiff contended that the trial court erred in allowing a percipient witness to answer the following question: " '[W]as this taper of a sufficient length and sufficient gradualness so the traffic could get through, all the long traffic could get through without hitting the barricades?' " (*Id.* at p. 33.) The appellate court concluded that the trial court had not erred in permitting the witness to answer the question. It explained: "Noll's opinion that the taper was long and gradual enough that long traffic could go through without hitting the barricades is the obvious result of his comparison of what he observed—the length of the taper and the maximum length and size of the vehicles he saw traveling through it without incident. This is little different than the matter of '[s]peed, distance, size, weight and the like [which] are properly described by such comparative expressions'; and [t]hat which is reasonably descriptive of a car in action is proper. [Citation.]' [Citation.] It falls clearly within the classification of permissible nonexpert opinions . . . ." (*Id.* at p. 34.)

▮ The court similarly concluded in *Healy v. Visalia etc. R. R. Co.* (1894) 101 Cal. 585 [36 P. 125], cited in *People v. McAlpin* (1991) 53 Cal.3d 1289, 1307–1308 [283 Cal.Rptr. 382, 812 P.2d 563]. There, the plaintiff was injured when the railroad handcar in which she was traveling jumped the track, threw her out of the vehicle, and ran over her. (*Healy, supra,* at pp. 588–589.) The jury returned a verdict for the plaintiff, and the defendant appealed, contending that another passenger should not have been allowed to answer the following question: " 'Under the circumstances, was it possible for an ordinary person, sitting in the position Mrs. Healy was sitting in, to stand the force of the jars and still retain her seat upon the car?' " (*Id.* at p. 589.) The court disagreed: "This question does not fall within the rule which excludes the opinion of a witness. The general rule is that the testimony of a witness shall be limited to the facts of which he has a personal knowledge, and that he shall not give his individual opinion thereon; but in many instances the opinion of a witness may be received in connection with his statement of the facts upon which it is based. The border line between fact and opinion is often very indistinct, and the statement of a fact is frequently only an opinion of the witness. Impressions or sensations caused by external

objects are not susceptible of exact reproduction or description in words, nor do they affect every individual alike, and the judgment or opinion of the witnesses by whom they have been experienced is the only mode by which they can be presented to a jury. The question asked of the witness in the present case did not call for an opinion from him depending upon facts which he had subsequently learned, but he was asked to describe the effect of the concussion or jar caused by the car leaving the track, as one of the facts out of which the injury had arisen, and which he had personally observed and felt. [¶] The position of the plaintiff on the car, as well as his own position thereon, the jumping of the car from the track, the effect produced upon himself, the sensation which he experienced thereby, were all facts which it was competent to show by his testimony, in order that the jury might get as clear an idea as possible of the circumstances under which the accident had occurred. The strength or force of this concussion was also a fact which it was proper to bring before the jury, and as it was not capable of exact measurement by any recognized standard, it was competent for the witness to state its strength or force according to the opinion or judgment which he formed at the time that he felt it. His judgment or opinion of its effect upon an ordinary person would be the most efficient mode of enabling the jury to fully appreciate it, and to give to it its proper consideration in determining its influence in producing the injury. Such testimony is competent upon the same principle that permits evidence showing the strength or force of a blow, the distance at which a sound can be heard, or the direction from which it comes, the speed of a horse, the degree of cold or heat, or of light or darkness. In any such instance a witness who had a personal experience or knowledge of the sensation is competent to testify, although his answer is only his opinion of the matter. The accuracy or strength of his testimony is to be tested by cross-examination. These observations apply also to the testimony of the witness that he thought that the car was too narrow for the track, and also to the testimony of another witness, as to the appearance of the plaintiff immediately after the accident." (*Id.* at pp. 589–590.)

The present case is analogous to *Bouse* and *Healy*. As in those cases, the "opinion" that plaintiff's counsel elicited from Llewellyn was an "[i]mpression[] or sensation[]" that was "not susceptible of exact reproduction or description in words." (*Healy, supra,* 101 Cal. at p. 589.) Further, the question asked of Llewellyn "did not call for an opinion from him depending upon facts which he had subsequently learned," but rather was based on events "which he had personally observed and felt." (*Id.* at pp. 589, 590.) Accordingly, the trial court did not err in admitting Llewellyn's testimony.

## DISPOSITION

We affirm the jury's liability finding as to Wyatt and we reverse it as to the City. We further affirm the jury's findings that Bowman was not contributorily negligent and that Bowman's damages are $15,735,404.

Because we have concluded that Bowman's direct liability theories against the City are not supported by substantial evidence, the only issue to be presented to the jury on retrial is whether the City is vicariously liable for Wyatt's negligence. In this regard, Bowman may retry his claim that Wyatt was an employee of the City. Bowman may also retry his nondelegable duty claim, so long as any such nondelegable duty theory does not depend on a claim that the City was the truck's motor carrier or that the truck's brakes failed.

Bowman's motions for sanctions against the City and its attorneys, and Wyatt and his attorneys, are denied. The City is awarded its costs on appeal. Bowman and Wyatt are to bear their own costs.

Epstein, P. J., and Willhite, J., concurred.

A petition for a rehearing was denied July 28, 2010, and the opinion was modified to read as printed above.