Filed 3/14/13  Vaynberg v. Chevron Products CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MOYSEY VAYNBERG,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CHEVRON PRODUCTS COMPANY,<br><br>        Defendant and Respondent. | A131126<br><br>(Contra Costa County<br>Super. Ct. No. MSC0801216) |

## I.  INTRODUCTION

Appellant Moysey Vaynberg worked for respondent Chevron Products Company (Chevron) through an employment agency for nine years, from August 1999 through April 2008.  For the last eight of those years, appellant worked through Value Added Consulting Group (Value Added).  Appellant sued Value Added[1] and Chevron for wage and hour violations, primarily the failure to pay him overtime.  At trial, there was no dispute that Value Added was appellant's employer; the main issue was appellant's employment relationship with Chevron.  Appellant contended that he was also an employee of Chevron, i.e., that Value Added and Chevron were appellant's "joint" or "dual" employers.  Chevron maintained that appellant was an independent contractor.  The jury returned a verdict for Chevron and the trial court denied appellant's motion for judgment notwithstanding the verdict.

---

[1] A default was entered against Value Added.  It is not a party to this appeal.

On appeal, appellant contends the trial court prejudicially misinstructed the jury on the common law test for an employment relationship and also erred in excluding evidence. Finding no reversible error, we will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Appellant sued Value Added and Chevron, alleging that he was employed by Value Added and that Chevron was his co-employer. He pleaded causes of action for (1) failure to pay overtime (Lab. Code, §§ 510, 1194), (2) failure to pay wages (Lab. Code, §§ 204, 218; Cal. Code Regs., tit. 8, § 11040), (3) failure to timely pay wages due upon termination (Lab. Code, §§ 201, 203, 218; Cal. Code Regs., tit. 8, § 11040), (4) failure to reimburse reasonable expenses (Lab. Code, § 2802), and (5) unfair, unlawful, and fraudulent business practices (Bus. & Prof. Code, § 17200 et seq.).

The case was tried to a jury. At trial, the following testimony was adduced.

Appellant initially worked at Chevron through Analysts International, an employment agency. When he left that agency, he asked Chevron to hire him as an employee. Chevron declined to hire him, but gave him the names of other agencies it used to staff its computer analyst positions. Appellant continued his work at Chevron as a Production Support Technical Analyst through Value Added.

In 2004, Chevron and Value Added entered into a Master Services Agreement (the Agreement). Pursuant to the Agreement, Value Added was to provide "Consulting Services" to Chevron, including Computer Programming, System Design, and Acceptance Testing services and personnel for Chevron's CAROL system.[2] Consultants were required to be proficient in the COBOL language used by the CAROL system.

Chevron considered Value Added to be a third-party vendor. The Agreement provided: "Contractor is performing the Services as an independent contractor.

---

[2] CAROL was Chevron's internal system that controlled all purchase transactions at all Chevron stations and ran the transactions from the point of sale through posting the purchase on the customer's Chevron credit card, other credit card, or debit card account. It also reconciled all payments made by customers to their Chevron-brand credit card accounts.

Contractor shall retain all authority to direct the supervision of its employees while providing Services under this Agreement. Contractor, its employees, agents and representatives are not employees or agents of Company [Chevron] or its affiliates. None of the Contractor's personnel shall be entitled to receive any compensation, benefits or other incidents of employment from Company or its Affiliates. Nothing in this Agreement shall be deemed to constitute a partnership or joint venture between Company (and its Affiliates) and Contractor."

At trial, appellant admitted that he was "aware at all times while [he was] working for Value Added that when [he was] assigned to the Chevron facility [he was] working there under a contract . . . ." He also acknowledged that he was retained for six to twelve month "assignments," and that he requested that his service order with Chevron be extended at the expiration of each assignment. When the service order came up for renewal, appellant understood that his Value Added supervisor, Peter Ngo, was working with Chevron to extend the service agreement. In renewing appellant's services, Chevron would contact Ngo by email, requesting Ngo's approval of the extension of the contract. The terms of the renewal identified appellant as a "contractor," Value Added as his "agency," the "contract dates," the hourly rate Chevron would pay Value Added for appellant's services (usually $75 per hour), the fixed extension duration (a period of months, usually from six to twelve), and the number of budgeted hours for appellant's work. Ngo would approve the terms and inform appellant of the renewal.

Appellant was paid by Value Added, which determined the amount and terms of his compensation. Value Added required appellant to record all of his time on time cards that he submitted to Value Added. The time cards identified Chevron as the "Client," Value Added as the "Agency," and listed the CAROL "project" and the number of hours appellant worked on each date. Value Added used these records to bill Chevron by the hour for its contractors' services.

Value Added paid appellant a monthly salary and a bonus based on billed hours. Value Added issued appellant his paychecks, paystubs, deducted payroll taxes, and provided him with medical and dental insurance. Appellant also later received

3

unemployment insurance from Value Added, not Chevron. Chevron never paid appellant directly and never provided him any benefits. When appellant wanted a raise, he spoke with Ngo, not Chevron, about increasing his pay.

Chevron sought contractors with "technical specialist degrees" to perform the production support team work. Appellant, with a bachelor's and a master's degree and two engineering licenses, met the requirements. Although he knew nothing about the CAROL system when he was hired, he had experience with COBOL, the language used by the CAROL system, and "extensive experience working in the computer field . . . ."

Chevron considered the CAROL system a legacy program that was slowly becoming obsolete and was slated ultimately to be discontinued. COBOL was an outdated programming language, familiar only to those who had been in the field for a long time.

Appellant learned the CAROL system by reviewing Chevron's CAROL documentation over the course of nearly a year before he was fully capable of performing his job using CAROL. He never received or required any formal training from Chevron.

Appellant was originally assigned to the production support team by Chevron supervisor Lori Wong. At first, appellant was one of a team of technical analysts, each of whom would be on-call every 20 weeks. Chevron determined this rotation was inefficient, and created a production support group composed of four technical analysts. Wong chose four technical analysts, including appellant, to be on the production support team.

The production support team had a rotating on-call system. Each of four team members would be the primary or "prime" on-call person 24 hours a day for one week out of every four. In addition, each of the four would serve as the secondary or back-up on-call person for another week out of every four.

Yvonne Blois, a Chevron employee, was the team leader of the Card Systems technical team from 2000 to 2003, and again from 2007 onward. As leader of the technical team, her responsibilities included production support. Brent Boozer, also a

4

Chevron employee, was in charge of the production support team in the intervening period, from January 2004 to April 2007.

The mainframe on which CAROL operated was not owned by Chevron; it was owned by a separate company, EDS. Problems with the system went first to the EDS help desk, which would resolve minor or routine issues. Issues requiring more technical ability or expertise would be assigned a "ticket" and sent to the production support team.

Joe Brennan, a contractor at Chevron through another agency, was the "de facto lead" of the production support team and was responsible for assigning "tickets." In making the assignments, Brennan would look to see who had the most time available or most familiarity with the issue, and would assign it to the team member he determined was best suited for it. Blois had assigned this task to Brennan, and he performed this function until 2007 when she assigned it to Chevron employee Rich Green. Brennan was also responsible for the on-call schedule, which he created with input from each of the contractors regarding their availability.

Appellant spent the majority of his time "working tickets," i.e., resolving program glitches with the CAROL system. According to appellant, 95 percent of the production support team's job was " 'restarting jobs and certain steps' " which were " 'pretty well defined from the job docs.' " According to Chevron, appellant's work involved specialized tasks that were " 'extremely complex.' " For example, appellant was responsible for analysis, research, repair, and testing of software; application development; working on system specifications and performing systems analysis; writing code, working on code enhancements, and preserving code integrity; and recommending changes and improvements to the system. In addition, once an issue was resolved, testing and quality assurance were a "big part" of the work.

Value Added was owned by Peter Ngo and his wife. Ngo was also a contract worker at Chevron through Value Added; he worked at the Chevron facility in Concord on the same floor as appellant. Ngo did not direct appellant's work. He did not provide appellant with training, did not assign him work, and did not conduct any performance evaluation. He had no role in scheduling appellant's work.

5

Value Added paid its employees once a month. It withheld taxes, unemployment, and social security from appellant's pay and issued him a W-2. Ngo testified that appellant was paid an annual salary of $51,000. He also testified that appellant was paid for every hour he worked. As an example, Ngo testified that if appellant worked 50 hours in a given week, he was paid for 50 hours by Value Added. Appellant worked for Value Added from 2000 to 2008. During that time, Chevron was the only company with which he was placed. Value Added terminated appellant's employment on the same day his final contract with Chevron expired: April 15, 2008.

Blois, who supervised the production support team for most of the time relevant herein, testified that she informed contractors of her expectations but did not micromanage their work. She did not direct them regarding how to perform their research or analysis; she only stated the results she wanted.

She considered appellant to be highly trained and skilled. He did not have to get her approval as to how to analyze, research, or fix a problem. If the fix required him to change data or change code, however, appellant was required to consult with someone prior to making the change.

Appellant testified that, if he could not resolve a ticket on his own, he would request help from one of the business analysts, who were Chevron employees. Chevron directed that if a ticket would require 12 or more hours of work it should not be handled by production support but rather should be reassigned to the technical team.

From time to time, appellant was assigned tasks that were outside of his normal production support work. Both Blois and Boozer assigned such tasks or special projects. Appellant was authorized to charge for the time he spent on such projects, rather than offset the hours with comp time, as he was otherwise required to do, because these projects were outside of his normal production support duties. Appellant worked on a special project known as the "taproot investigation," which involved a glitch in the transmission of credit card transaction files that caused duplicate billings. Appellant also worked on projects involving Proterm, an application that permitted the writing of a single program to update large amounts of data. Appellant obtained expertise in Proterm

while working for Chevron, and was considered the production support team expert on Proterm.

Blois testified that it was "negotiable" whether appellant had to spend at least eight hours per day at the Chevron facility. She said there was no minimum number of hours he was required to be on-site. Rather, the only requirement was that he work the number of hours he billed. Brennan testified that production support team members were required to be at the Chevron site eight hours per day, 40 hours per week. Boozer testified similarly, that he expected appellant to work at the Chevron facility during the three weeks of each month that he was not on-call. He said contractors could occasionally work from home, but only with his approval.

In 2004, Boozer checked records for a three-month period and noticed that appellant was on the premises an average of only six hours per day. The number of hours appellant had billed during that time was not the same as the number of hours he was on-site. Boozer testified at trial that he was "very concerned" because "the way it looked is that he was charging us for time that he had not put in . . . ." He confronted appellant about the issue.

Appellant explained that he had been working with Proterm from home after hours because of the expense and difficulty of using Proterm during the day; Boozer accepted his explanation but stated that, going forward, he wanted appellant to work from the Chevron office. At his deposition, Boozer testified that he did not recall whether appellant offered an explanation or whether appellant told him he had been working from home. At trial, Boozer initially testified that he did not think appellant had "any explanation as to why there was a discrepancy in the hours." Later he testified, "I can't really remember what [appellant] said."

Following the confrontation, Boozer instructed appellant to be in the office 40 hours per week, and appellant did so. Boozer did not discuss appellant's hours with Ngo and did not express to Ngo any concerns with appellant's job performance.

Production support team members recorded their time worked on Chevron time sheets and on time sheets for their agency. Prior to November 2004, team members were

instructed to report their actual hours worked on Chevron time sheets, but that their agency time sheets "should always reflect a 40 hour work week."

That rule was changed in November 2004, at which time they were instructed, going forward, that "[a]gency time sheets [are] to reflect the same number of hours as reported on Company timesheets." They were also instructed that the "company rule" required "the OnCall person to take unpaid time off equal to the actual overtime hours worked during the OnCall week."

Chevron did not want team members billing more than 40 hours per week. Boozer explained that it was important for Chevron to stay within budget for contractors, and, to do so, Chevron wanted contractors to balance their time out to 40 hours per week. The production support team manager, either Boozer or Blois, was responsible for coordinating the equalization of unpaid time off and actual overtime.

Boozer instructed appellant to notify him and everyone on the team when he was scheduling his comp time. Appellant would send emails indicating when he intended to take time off. On one occasion, Boozer discovered that appellant had accumulated 42 excess hours. He asked appellant to balance this time out over several weeks. He testified that he was surprised that appellant had accumulated so much excess time.

Blois also imposed restrictions on appellant's accumulation of overtime hours and his taking of comp time. In April 2007, appellant asked to take off the week of May 7. At trial, Blois testified that appellant did not need her approval, that she had no authority to prevent him from taking time off. However, by email on April 18, 2007, she replied: "My inclination is to say no but I have a consult into Brent [Boozer]." Blois was concerned that appellant was "overbooking" or "padding" his hours. She was concerned because appellant's hours were higher than other people's for doing the same amount of work, and Chevron had a budget based on 40 hours of work per week.

The next day, on April 19, 2007, Blois instructed appellant: "From here on out, you will advise me the day of and or the following day when you have accrued any OT and you will use this time within a 2 week period, and you will tell me when you intend to utilize this time." She testified at trial that this was her way of trying to "keep

8

verification" going forward.  She wanted to be informed when appellant would not be in the office so she could keep better track of his hours for budgetary purposes.

Later on the same day, Ngo, the owner of Value Added, emailed Blois seeking her "permission" to talk to appellant about his plan to take a week off as comp time.  Ngo wrote, "I promise to be very diplomatic and not messing up [sic].  I promise to run to you for help and I promise to report back to you on what's the outcome."  Blois replied, "In theory, he is your employee so you can speak to him as you wish, however, it may be a good idea if you and I discuss the latest outcomes."

Thereafter, appellant would customarily advise Blois by email of the overtime hours he worked and the dates and times he proposed to take comp time to offset them.  Two months later, Blois announced that the entire production support team had to work to reduce the number of hours of overtime.

According to respondent, Chevron did not establish any work schedule for appellant.  The contractors advised each other and Chevron when they would be unavailable, working from home, or not on the premises.

According to respondent, appellant also never had to ask Chevron for time off.  "He worked the hours he pleased when he pleased."  Chevron's interest regarding the contractors' availability was ensuring that there were experts on-hand to address any issues as they arose with the CAROL system.  Chevron tracked the contractors' hours to ensure that labor costs did not exceed the budgeted or contracted-for amounts, and to ensure that the contractors were actually working during the time billed to Chevron.

Appellant received training at Chevron when it implemented new versions of computer programs.  Appellant attended weekly, hour-long meetings run by the production team manager, either Blois or Boozer.  Both contractors and Chevron employees were required to attend.  The meetings included members of the production support team and individuals from other teams, and addressed matters such as happenings at the company, the tickets team members were working on, and any issues people were having, "in order to improve . . . cross-communication amongst the different teams."

9

Chevron also held implementation meetings at least once a month which appellant was required to attend.

Blois testified that she had the right to discontinue appellant's services at any time. Boozer said he never filled out performance reviews for contractors, but that he and his boss had the option of whether or not to renew the contract of a contractor. In making that decision, they would take into account the performance of the individual whose contract was up for extension.

Because the CAROL system contained confidential account information, its security had to be protected. Chevron provided production support team members with laptops and a virtual private network to access the system from home. Chevron also provided pagers to team members to use when they were on-call. Appellant was reimbursed by Value Added for other work-related expenses such as a printer, paper, security software, internet, office supplies, car maintenance, and travel expenses. Appellant never submitted expense requests to Chevron.

According to appellant, although the Value Added payment worksheets prepared by Ngo apportioned appellant's gross pay to "salary" and "bonuses," appellant testified that he was not on a salary. Appellant was paid by the hour the entire time he worked at Chevron, and that Ngo's accounting was "a mystery." Chevron was the only work assignment Value Added ever gave him.

During his time with Chevron, appellant was always aware that he was working under a contract. He was involved with his contract renewals and would ask for his contract to be extended. He considered himself an independent contractor, not an employee of Chevron, but understood that the job was "pretty much continuous." The term of the contract could not be indefinite, however, so it was usually extended for at least six months.

Boozer testified that he always considered appellant to be an independent contractor. He never treated appellant like an employee; he never intended appellant to be an employee; and appellant never acted like an employee. Blois testified the she never

considered appellant to be a Chevron employee, and she never tried to treat appellant as she would a Chevron employee.

When Chevron announced that it was going to sell its credit card business, it offered retention bonuses to encourage both contractors and employees to remain on the job until the credit card business was terminated. It also offered to try to find jobs within Chevron for contractors and employees who would otherwise lose their positions when the credit card business ceased operations. Ngo helped appellant with preparing his resume and tried to find him a new assignment.

After a lengthy trial, the jury found by special verdict that appellant was not an employee of Chevron. The jury therefore did not reach any of the other issues. Appellant's motions for a new trial and for judgment notwithstanding the verdict were denied.

Appellant filed a timely notice of appeal from the judgment.

### III. DISCUSSION

A.     *Alleged Instructional Error.*

1.     *The Challenged Instruction Did Not Correctly State the Applicable Law.*

a.     *Background.*

At Chevron's request, the trial court instructed the jury: "Chevron contends that Mr. Vaynberg was not entitled to overtime pay from Chevron because he was an employee of Value Added working at Chevron as an independent contractor, not an employee of Chevron. In deciding whether Mr. Vaynberg was an independent contractor, you must first decide whether Chevron had the right to completely control the manner and means by which Mr. Vaynberg performed his work, rather than just the right to specify or request a desired result. [¶] If Chevron had complete authority to supervise the specific details of Mr. Vaynberg's work and to exercise complete control over his work, as opposed to just giving him suggestions as to the details, then this is one of the factors you may consider."

Appellant contends that this instruction is erroneous because, under a dual employment relationship, as appellant alleged he had with Chevron and Value Added, it

11

is not necessary that Chevron have a right of *complete* control.  The parties both submitted jury instructions based on the common law definition of employment to assist the jury in distinguishing between an employee and an independent contractor.  The parties agree that the existence of control is the most important factor, but not the only one, in making this determination.  At trial, appellant contended that, although he was originally hired by Value Added to work at Chevron as an independent contractor, Chevron assumed sufficient control over his work and working conditions that his relationship to Chevron was that of employee to dual employer, with control shared by Chevron and Value Added.  Under these circumstances, appellant argues, the challenged instruction misled the jury by suggesting or implying that Chevron's control over appellant had to be "complete" to satisfy the control factor.

"We review de novo whether a challenged instruction correctly states the law." (*Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 298 (*Bowman*), and cases cited therein.)

                b.    *The Law*.

The common law pertaining to the distinction between employees and independent contractors developed largely around workers compensation and unemployment insurance cases, where liability for misconduct or negligence and/or eligibility for benefits were primarily at issue.  "The 'seminal case' [citation] addressing the employee/independent contractor distinction is *Empire Star Mines Co. v. Cal. Emp. Com.* (1946) 28 Cal.2d 33 (*Empire Star*), overruled on other grounds in *People v. Sims* (1982) 32 Cal.3d 468, 479-480, footnote 8.  That case arose under the Unemployment Insurance Act, pursuant to which employers were required to pay unemployment insurance taxes for employees, but not for independent contractors.  (*Empire Star*, at p. 36.)  In affirming the trial court's determination that the defendant mining company's lessees were independent contractors, the Supreme Court identified a number of factors relevant to distinguishing independent contractors from employees.  The most important factor was 'the right to control the manner and means of accomplishing the result desired.  If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists.'  (*Id*. at p.

12

43.)  The court also identified a series of 'other factors' to be taken into consideration: '(a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.  [Citation.]'  (*Id.* at pp. 43-44.)" (*Bowman, supra,* 186 Cal.App.4th at pp. 299-300; see also *S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350-351 (*Borello*), and cases cited therein [explaining that the right of control is the primary factor in determining whether a worker is an independent contractor or an employee, and that secondary factors must also be considered].)

Empire Star, Borello, and Bowman all addressed the employee/independent contractor distinction in the context of a single employer.

Dual employment, of necessity, involves two employers.  "The possibility of dual employment is well recognized in the case law.  'Where an employer sends an employee to do work for another person, and both have the right to exercise certain powers of control over the employee, that employee may be held to have two employers—his original or "general" employer and a second, the "special" employer.'  (*Miller v. Long Beach Oil Dev. Co.* (1959) 167 Cal.App.2d 546, 549.)  In *Industrial Ind. Exch. v. Ind. Acc. Com.* (1945) 26 Cal.2d 130, 134-135, this court stated that 'an employee may at the same time be under a general and a special employer, and where, either by the terms of a contract or during the course of its performance, the employee of an independent contractor comes under the control and direction of the other party to the contract, a dual employment relation is held to exist.  [Citations.]' "  (*Kowalski v. Shell Oil Co.* (1979) 23 Cal.3d 168, 174 (*Kowalski*).)

13

In *Kowalski*, the plaintiff was employed by a maintenance company and was working at a Shell refinery, operating a radial saw when his hand was amputated. He brought a personal injury action against Shell, which claimed he was a special employee under the contract Shell had with the maintenance company and, thus, the plaintiff's exclusive remedy was under the workers compensation law. (*Kowalski*, *supra*, 23 Cal.3d at pp. 171-172.) The jury found that Kowalski was not Shell's special employee.

In determining whether substantial evidence supported the jury's finding, the Supreme Court noted that "the courts have looked to a number of factors as evidentiary indicia of the existence of a special employment relationship. 'The paramount consideration appears to be whether the alleged special employer exercises control over the details of [an employee's] work. Such control strongly supports the inference that a special employment exists.' [Citations.] However, '[t]he fact that instructions are given as to the result to be achieved does not require the conclusion that a special employment relationship exists.' [Citations.]" (*Kowalski*, *supra*, 23 Cal.3d at pp. 176-177.) In addition, evidence that the alleged special employer has the power to discharge the worker is strong evidence of a special employment relationship, while the payment of wages is not determinative. "Other factors to be taken into consideration are 'the nature of the services, whether skilled or unskilled, whether the work is part of the employer's regular business, the duration of the employment period, . . . and who supplies the work tools.' [Citations.] Evidence that (1) the employee provides unskilled labor, (2) the work he performs is part of the employer's regular business, (3) the employment period is lengthy, and (4) the employer provides the tools and equipment used, tends to indicate the existence of special employment. Conversely, evidence to the contrary negates existence of a special employment relationship. [¶] In addition, consideration must be given to whether the worker consented to the employment relationship, either expressly or impliedly, and to whether the parties believed they were creating the employer-employee relationship. [Citation.]" (*Id.* at pp. 177-178, fn. omitted.)

We observe that there are two different types of special employment, one in which the general employer relinquishes all control to the special employer, and one in which

14

the general employer relinquishes only partial control. In the former situation, the special employer becomes solely responsible for the employee's actions and the general is relieved of all liability; in the latter, the special and the general employers are dual or joint employers and share liability "concurrently and simultaneously, jointly and severally . . . ." (*Marsh v. Tilley Steel Co.* (1980) 26 Cal.3d 486, 492, 494-495 (*Marsh*); see also *Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 216 (*Brassinga*) ["*Marsh* itself made clear that relinquishment of 'all' control is not necessary for creation of a special employment relationship."].)

*Marsh*, *Kowalski*, and *Brassinga* are cases involving personal injury tort and workers compensation remedies, as are *McFarland v. Voorheis-Trindle Co.* (1959) 52 Cal.2d 698 (*McFarland*) and *Riley v. Southwest Marine, Inc.* (1988) 203 Cal.App.3d 1242, which appellant also cites. These dual employer cases involved a right to control test where each employer had " ' "some power, not necessarily complete, of direction and control." ' " (*McFarland*, *supra*, 52 Cal.2d at p. 704.)

In *Martinez v. Combs* (2010) 49 Cal.4th 35, 50, 59, 76 (*Martinez*), our Supreme Court had occasion to consider the nature of the employment relationship and alleged dual employers in the context of wage claims brought under state law. In *Martinez*, seasonal agricultural workers brought an action under Labor Code section 1194 to recover unpaid minimum wages. (*Martinez*, *supra*, 49 Cal.4th at p. 42.) The plaintiffs filed the action against the bankrupt strawberry farm operator who hired them, Munoz, and two produce merchants, Apio and Combs, who had stopped selling Munoz's strawberries. (*Id*. at pp. 42-43.) There was no question that Munoz employed the plaintiffs; the produce merchants' liability turned on whether they were joint employers with Munoz. (*Martinez*, *supra*, 49 Cal.4th at p. 45.) Concluding that, as a matter of law, the produce merchants did not jointly employ the plaintiffs, the trial court granted the produce merchants' motion for summary judgment. The Supreme Court concluded that the evidence failed to raise a triable issue of fact as to whether the produce merchants ever supervised or exercised control over the plaintiffs' working conditions. (*Id*. at p. 76.)

15

Before addressing the merits, the Supreme Court analyzed the term "employment" for the first time in the context of state wage and hour violation cases. It held that, in actions under Labor Code section 1194 to recover unpaid wages, the applicable Industrial Welfare Commission (IWC) wage order defines the employment relationship and, thus, who may be held liable as an employer for unpaid wages.[3] (*Martinez*, *supra*, 49 Cal.4th at p. 52.) Although the factual situation, procedural posture, and the applicable wage order here are different, the *Martinez* court's consideration of the employment relationship required for Labor Code wage laws to apply has direct bearing on this case. The IWC defines employer as "a person who 'employs or exercises control over the wages, hours, or working conditions of any person.' " The *Martinez* court observed that, "phrased as it is in the alternative (i.e., 'wages, hours, *or* working conditions'), the language of the IWC's 'employer' definition has the obvious utility of reaching situations in which multiple entities control different aspects of the employment relationship, as when one entity, which hires and pays workers, places them with other entities that supervise the work. Consistently with this observation, the IWC has explained its decision to include the language in one modern wage order as 'specifically intended to include both temporary employment agencies and employers who contract with such agencies to obtain employees within the definition of "employer." ' " (*Martinez*, *supra*, 49 Cal.4th at p. 59, fns. omitted.)

The court later emphasized this point again: "As we have explained, one of the reasons the IWC defined 'employer' in terms of exercising control was to reach situations

---

[3] The *Martinez* plaintiffs alleged the applicability of IWC wage order No. 14, which defines "[e]mploy" as "to engage, suffer, or permit to work"; "[e]mployee" as "any person employed by an employer"; and "[e]mployer" as "any person as defined in Section 18 of the Labor Code, who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." (Cal. Code Regs., tit. 8, § 11140, subd. 2(C), (F), (G) (wage order No. 14); *Martinez*, *supra*, 49 Cal.4th at p. 42.) In the instant case, appellant alleged the applicability of wage order No. 4, in which the definitions of "[e]mploy," "[e]mployee," and "[e]mployer" are identical to those in wage order No. 14. (Cal. Code Regs., tit. 8, § 11040, subd. 2(E), (F), (H).)

in which multiple entities control different aspects of the employment relationship. This occurs, for example, when one entity (such as a temporary employment agency) hires and pays a worker, and another entity supervises the work. [Citation.] Supervision of the work, in the specific sense of exercising control over how services are performed, is properly viewed as one of the 'working conditions' mentioned in the wage order. To read the wage order in this way makes it consistent with other areas of the law, in which control over how services are performed is an important, perhaps even the principal, test for the existence of an employment relationship. (See, e.g., *Metropolitan Water Dist. v. Superior Court* [(2004)] 32 Cal.4th 491, 512 [common law]; *Tieberg v. Unemployment Ins. App. Bd*. (1970) 2 Cal.3d 943, 946 [(*Tieberg*)] [unemployment insurance]; *McFarland*[, *supra*,] 52 Cal.2d [at p.] 704 [workers' compensation].)" (*Martinez*, *supra*, 49 Cal.4th at p. 76.)[4]

   c.  *Analysis*.

  Appellant's theory of the case was that Chevron and Value Added were dual employers in that they shared control over appellant or, phrased another way, Value Added relinquished partial control over appellant to Chevron. The challenged instruction, however, required the jury to decide whether Chevron had the right of *complete* control or *complete* authority over appellant's work. We agree with appellant that, in the context of dual employers, the instruction was an incorrect statement of the law.

  Chevron's arguments to the contrary are not persuasive. First, Chevron relies on *Empire Star*, *supra*, 28 Cal.2d at page 43, which used the "complete control" language: "If the employer has the authority to exercise complete control, whether or not that right

---

  [4] Although *Martinez* was issued by the Supreme Court shortly before this matter went to trial, it does not appear that the parties or the trial court considered it in setting the jury instructions. Likewise, neither party argues error based on *Martinez* in this appeal. Accordingly, we will not consider the issue.

17

is exercised with respect to all details, an employer-employee relationship exists."[5]  As more recent support for this standard, Chevron cites *Borello*, *supra*, 48 Cal.3d 341, but quotes from the dissenting opinion at page 366 ("A material and often conclusive factor is the right of an employer to exercise complete and authoritative control of the mode and manner in which the work is performed") without identifying it as such.  (*Borello*, *supra*, 48 Cal.3d at p. 366, dis. opn. of Kaufman J.)  The majority in *Borello* does not refer to "complete control."

The other cases Chevron relies on as recent authority interpreting the right-to-control factor merely cite or derive from *Empire Star* and *S.A. Gerrard Co.* without analysis on this point.  (See *Bowman, supra,* 186 Cal.App.4th at p. 299 [quoting *Empire Star*, *supra*, 28 Cal.2d at p. 43:  " 'If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists.' "]; *Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 873-874 [same]; *Varisco v. Gateway Science & Engineering, Inc*. (2008) 166 Cal.App.4th 1099, 1103 (*Varisco*) [quoting *S.A. Gerrard Co.*, *supra*, 17 Cal.2d at p. 414:  " 'But this rule requires that the right to exercise complete or authoritative control, rather than mere suggestion as to detail, must be shown.' "]; *Ali v. U.S.A. Cab Ltd*. (2009) 176 Cal.App.4th 1333, 1347 [attributing the same sentence to *Varisco*].)  In any event, none of these cases addresses the right-to-control factor in the context of dual employment.

Chevron also argues that appellant invited the error of which he now complains by proposing two jury instructions that were based on the common law of employment and that, according to Chevron, suggested that the right of control must be exclusive or complete.  "The 'doctrine of invited error' is an 'application of the estoppel principle': 'Where a party by his conduct induces the commission of error, he is estoped from

---

[5] Chevron's assertion that the Supreme Court first articulated this test in *Empire Star* is incorrect.  The test predates *Empire Star*.  (See, e.g., *S.A. Gerrard Co. v. Industrial Acc. Com*. (1941) 17 Cal.2d 411, 413-414 (*S.A. Gerrard Co.*); *Moody v. Industrial Acc. Com*. (1928) 204 Cal. 668, 670.)

asserting it as a ground for reversal' on appeal. [Citation.]' . . . [T]he doctrine 'prevent[s] a party from misleading the trial court and then profiting therefrom in the appellate court." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403.) The doctrine "requires affirmative conduct demonstrating a deliberate tactical choice on the part of the challenging party." (*Huffman* v. *Interstate Brands Companies* (2004) 121 Cal.App.4th 679, 706.)

The argument is entirely without merit. The record shows that appellant expressly withdrew both instructions, requested an instruction on joint employment, and consistently opposed an instruction requiring a right of complete control. There is no support in the record for a contention that appellant engaged in a deliberate trial strategy to mislead the trial court or any indication that the trial court was misled as to appellant's position.

Attempting to distance this case from *Martinez*, Chevron contends that "*Martinez* did not consider whether, under the common law test, a joint employment relationship where an employee can recover overtime wages from either employer, can be established under a lesser right to control standard." Although *Martinez* held that the applicable wage orders, not the common law, properly defined the employment relationship under Labor Code section 1194, the common law was not irrelevant to its analysis: "This is not to say that the common law plays no role in the IWC's definition of the employment relationship. In fact [and as discussed above], the IWC's definition of employment incorporates the common law definition *as one alternative*." (*Martinez, supra*, 49 Cal.4th at p. 64 [one of the three alternative definitions of "[t]o employ" is "to exercise control over the wages, hours, or working conditions"].)

We interpret Chevron's position to be that, although *Martinez* supports the applicability of the concept of dual employment in the wage and hour context, *Martinez* itself does not stand for the proposition that dual employment may be established by a showing of partial or shared control. However, as appellant points out, shared control is "the very essence of a joint or dual employment." (See, e.g., *Service Employees Internat. Union v. County of Los Angeles* (1990) 225 Cal.App.3d 761, 773 [dual or joint

employment arises only where both the general employer and the special employer have the right to control the employee's activities]; *County of Los Angeles v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 391, 405 [dual employment exists where the general employer sends an employee to work for the special employer and both have the right to control the employee's activities].) Moreover, the central issue in *Martinez* involved this precise question: did the plaintiffs show sufficient shared or partial control by the produce merchants such that they were liable for wages under Labor Code section 1194? (*Martinez*, *supra*, 49 Cal.4th at p. 49.)

Finally, Chevron argues that *Martinez* questioned the "continued applicability" of the common law employment factors in the wage and hour context. The *Martinez* plaintiffs attempted to compare their case with *Borello*, *supra*, 48 Cal.3d 341, in which the Supreme Court held that workers hired by a large agricultural landowner under "sharefarmer" agreements were employees, not independent contractors, for purposes of workers compensation law. The *Borello* court applied the common law test of employment in light of the remedial purposes of the workers compensation law, and concluded that the sharefarmers were workers the law intended to protect. (*Martinez*, *supra*, 49 Cal.4th at p. 73.) The *Martinez* court distinguished *Borello*: "Assuming the decision in [*Borello*], *supra*, 48 Cal.3d 341, has any relevance to wage claims, a point we do not decide, the case does not advance plaintiffs' argument. Plaintiffs are correct in that, if Munoz had been Apio's employee rather than an independent contractor, Munoz's employees arguably would also have been Apio's employees; the determination that a purported independent contractor is in fact an employee raises the strong possibility, generally speaking, that the contractor and its employer jointly employ the contractor's employees. [Citation.]" (*Martinez*, *supra*, 49 Cal.4th at p. 73.) *Martinez* proceeded to apply the common law employment factors to Munoz, contrasting his independent contractor status with that of the *Borello* sharefarmer-employees. (*Ibid*.) We disagree with Chevron that this discussion means any more than the court said it did, i.e., it addressed the plaintiffs' argument based on *Borello*, assuming without deciding the relevance of that case to wage claims.

20

The plaintiffs in *Martinez* also argued that "the *right* to exercise control over the manner in which work is performed is sufficient to prove the existence of an employment relationship, whether or not the right is exercised," once again relying on *S.G. Borello*. (*Martinez*, *supra*, 49 Cal.4th at p. 76.) Once again, the Supreme Court assumed, without deciding, that this rule applied in the wage and hour context, and then concluded the argument had no merit on the facts. (*Ibid.*) We again reject Chevron's contention that this discussion has any bearing on the quantum of control required to establish a joint or dual employment.

2.      *The Instruction Was Not Prejudicial.*

Although the instruction was erroneous, "there is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' [Citation.]" (*Soule v. General Motors Corp*. (1994) 8 Cal.4th 548, 580 (*Soule*); see Cal. Const., art. VI, § 13.) The instructional error is harmless if it is not reasonably probable appellant would have obtained a more favorable result in its absence. (*Soule*, *supra*, 8 Cal.4th at p. 570.)

"In determining whether instructional error was prejudicial, a reviewing court evaluates ' "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled" ' to determine whether it is 'reasonably probable' that erroneous instructions misled the jury. [Citations.] 'A "reasonable probability" in this context "does not mean more likely than not, but merely a *reasonable chance*, more than an abstract possibility." [Citations.]' " (*Bowman*, *supra*, 186 Cal.App.4th at p. 304.)

a.      *State of the Evidence.*

Here, the evidence regarding the terms and conditions of appellant's working relationship with Chevron was largely undisputed. While appellant emphasized certain aspects of the evidence, such as the amount of control over his work schedule exerted by

21

Blois and Boozer, the length of time he worked continuously at Chevron, and that Chevron supplied instrumentalities for doing the job, Chevron emphasized other aspects, such as the expertise required to do the job, the inability of Blois and Boozer to control or direct the substance of appellant's work because they did not have the technical expertise, and the series of contracts and budgets under which appellant was retained.

b.     *Effect of Other Instructions*.

The other instructions pertaining to the employment relationship between appellant and Chevron state the parties' basic contentions, and provide guidance on making the determination whether appellant was Chevron's employee or an independent contractor. The jury was instructed that "a primary factor" is "which party has the right to control the manner and means of accomplishing the result desired. . . . [¶] Thereafter, even if you decide that Chevron did or did not have the right of control, then you must consider all the other secondary factors in deciding whether [appellant] was Chevron's employee or an independent contractor." The secondary factors the jury was advised to consider were: "1. Whether there is a right to discharge at will, without cause. [¶] 2. Whether or not the one performing services is engaged in a distinct occupation or business. [¶] 3. Whether the work is usually done under the direction of an employer or by a specialist without supervision. [¶] 4. The skill required. [¶] 5. Who supplies the instrumentalities, tools, and place of work of the one performing services. [¶] 6. The length of time for which the services are to be performed. [¶] 7. The method of payment, whether by time or by the job. [¶] 8. Whether or not the work is part of a regular business of the beneficiary of the services. [¶] 9. Whether or not the parties believe they are creat[ing] a relationship of master and servant. [¶] The most important factor in whether there is an employer/employee relationship is the right of control; however, no single factor is dispositive and all should be considered together. If you decide that

22

Chevron is the employer, or one of the employers, then that would be a basis to determine the liability of Chevron."[6]

These instructions made clear that the jury was to consider *all* of the enumerated factors: the primary factor of control, all of the secondary factors, and all of the factors together, in determining whether appellant and Chevron had an employment relationship. This concept was stated no fewer than five separate times: (1) control is "one of the factors you may consider;" (2) the right of control is "a primary factor;" (3) the right of control need not be exercised; if it existed, then appellant "may or may [not] be an employee;" (4) whether or not Chevron had the right of control, the jury then "must consider all the other secondary factors;" and (5) "[t]he most important factor . . . is the right of control; however, no single factor is dispositive and all should be considered together."

c.     *Effect of Counsels' Argument.*

In lengthy closing arguments totaling nearly 100 pages of transcript, both sides argued the right of control, among various other issues. Appellant's counsel focused on the evidence that Chevron had the right to control or exerted control over various aspects of appellant's work. Early in his argument, counsel for Chevron stated that, in deciding whether appellant was an independent contractor or an employee, the jury must first decide whether "Chevron had the right to—and here are the magic words—completely control the manner and means by which [appellant] performed his work, rather than just the right to specify or request a desired result. What that means is they had the right to go in to tell [appellant] this is how you perform your research, this is how you perform your analysis, and this is how you do your fix, the very details of the work . . . ." Counsel argued that "no one at Chevron ever had the right of control to tell [appellant] how to

_____

[6] The instructions also stated that the existence of a verbal or written agreement characterizing the parties' relationship would be a significant factor in making the determination, but that it could be ignored if the parties' actual conduct differed from the characterization. Finally, the instructions advised the jury that, because of the presumption in favor of employee status, Chevron had the burden of proving that appellant was an independent contractor.

perform the details of his work." Thereafter, Chevron's counsel referred only to "control" and "the right of control," not "complete control," in arguing that appellant was an independent contractor and not an employee.

Based on our reading of the transcript, it appears that the distinction Chevron sought to draw with respect to control was between controlling how the actual work of computer systems analysis, research, and repair was done, on the one hand, and controlling supervisory tasks such as assigning the work, providing access to secure systems, and establishing the work schedule, on the other. Chevron emphasized control of the *manner and means* of performing the work rather than the quantum of control over the work having to be *complete* control. We find no reasonable probability that this single reference to "complete control" adversely affected the result.

### d. *Any Indications the Jury Was Misled*.

Finally, there is no indication that the jury was misled by the erroneous instruction. Prior to closing arguments, the court responded to a question from the jury. The jury asked, " 'Please explain why you're not seeking these damages from Value Added Consulting Group, Inc. along with or instead of Chevron[.]' " The stipulated answer was, " 'The plaintiff Moysey Vaynberg is pursuing Value Added Consulting Group separately.' " This question reflects no confusion on the part of the jury regarding the right of control factor. The jury asked no other questions before rendering a verdict. By a vote that was not close (10 to 2), the jury determined that appellant was not an employee of Chevron during the relevant time period, and there were no inconsistencies in the verdict that might suggest confusion.

Accordingly, we find that there is no reasonable probability that, in the absence of the error, appellant would have obtained a more favorable result. (*Soule*, *supra*, 8 Cal.4th at p. 570.) Thus, we conclude that the instructional error was harmless. (*Ibid.*)

### B. *Exclusion of Evidence*.

Appellant also challenges the trial court's exclusion of Chevron's HR Policy 305, entitled "Services of Former Employees" (HR Policy 305).

HR Policy 305 provided, in part: "Contracting directly with a former employee for professional services is handled the same as with any other independent contractor. To maintain an independent contractor relationship, the company cannot: [¶] [] directly supervise the contractor. [¶] [] require compliance with detailed instructions. [¶] [] require prescribed working hours. [¶] [] use a contractor who is solely dependent on the company for business. [¶] [] impose any other working conditions that directly or indirectly establish an employer-employee relationship."

Appellant sought to introduce into evidence two versions of this policy, one in effect from October 2001 to September 2006, and the other in effect thereafter.

Chevron moved in limine to exclude its internal human resources (HR) policies, including HR Policy 305, on grounds of irrelevance and Evidence Code section 352. Chevron argued that the policies would "mislead the jury as to the correct standard for evaluating Chevron's purported liability" because its "HR policies are stricter than what the law provides and requires." Appellant opposed the motion, arguing that the jury would understand the difference between instructions on the proper legal standard to apply when determining liability and a company's internal policies that "may or may not invoke different standards." The court ruled that HR Policy 305 could be used by appellant only "for impeachment purposes if needed."

We review a trial court's decision to exclude evidence for abuse of discretion. (*Thompson v. County of Los Angeles* (2006) 142 Cal.App.4th 154, 168; *San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1419.) " ' "In the absence of a clear showing that its decision was arbitrary or irrational, a trial court should be presumed to have acted to achieve legitimate objectives and, accordingly, its discretionary determinations ought not [to] be set aside on review." [Citation.]' " (*Ajaxo Inc. v. E*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 45.) Even where exclusion of the evidence was erroneous, however, reversal is only proper when there is a reasonable probability that a more favorable result would have been achieved absent the error. (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431-1432; see also Cal. Const., art. VI, § 13

[judgment will not be reversed for improper exclusion of evidence absent the reviewing court's opinion that the error has resulted in a miscarriage of justice.].)

Appellant contends HR Policy 305 was relevant to one of the secondary factors to be considered in determining whether an employment relationship exists under the common law, i.e., whether the parties believe they are creating the relationship of employer-employee. (*Tieberg*, *supra*, 2 Cal.3d at p. 949; *S.G. Borello*, *supra*, 48 Cal.3d at p. 351.) Appellant argues that HR Policy 305 was evidence of what Chevron believed were the practices that had to be avoided in order to maintain an independent contractor relationship and, conversely, to avoid creating an employment relationship.

Further, appellant contends he was prejudiced by the exclusion of the evidence because Chevron elicited testimony from appellant that he considered himself an independent contractor, not an employee, of Chevron. In addition, Boozer and Blois testified that they considered appellant to be an independent contractor; they never considered him an employee; and they never treated him as an employee. Chevron argued these points to the jury: "Not one witness testified in this case that Mr. Vaynberg was an employee of Chevron at any time. [¶] Indeed, even Mr. Vaynberg himself, the plaintiff in this case, testified that he was not an employee of Chevron. . . . Mr. Vaynberg admitted to you that at all times while working on assignment at the Chevron facility he was a contractor of Chevron."

Appellant's contentions are unpersuasive. First, the policy on its face applies to "former employees," and there is no evidence to suggest that appellant fits this category. If the policy was applied more broadly by Chevron, there is no evidence to that effect. Second, although appellant contends the policy is relevant to whether Chevron believed it was creating an employee-employer relationship with appellant, there is no evidence that any of the Chevron employees who were allegedly creating this relationship had ever read the policy or were aware of it. Third, under the trial court's ruling, appellant was permitted to use the policy for impeachment purposes, and appellant did in fact use the policy with one witness. Presumably, he could have attempted to impeach other witnesses with it as well. Finally, despite the ruling below, appellant read the policy to

the jury and published it during opening statements.  No abuse of discretion has been shown.

## IV.  DISPOSITION

The judgment is affirmed.


_____
Haerle, Acting P.J.


We concur:


_____
Lambden, J.


_____
Richman, J.